KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
WILLIAM M. GOODMAN (SBN 61305)
WGoodman@kasowitz.com
101 California Street, Suite 2300
San Francisco, CA 94111
Telephone:  (415) 421-6140
Facsimile:  (415) 398-5030

Attorneys for Plaintiff NUCAL FOODS, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUCAL FOODS, INC., a California cooperative,<br><br>                    Plaintiff,<br><br>        v.<br><br>QUALITY EGG LLC, an Iowa Limited Liability Company; WRIGHT COUNTY EGG, an Iowa company; and HILLANDALE FARMS OF IOWA, INC., an Iowa corporation,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

## SUMMARY OF CASE

1. This case involves the defendants' sale of tainted eggs to plaintiff NuCal Foods Inc. ("NuCal"), a farming cooperative based in Ripon, California, over the course of several months this year.

2. Defendants' first sales to NuCal were in late May 2010. Within days of these sales, the defendants' farms tested positive for Salmonella contamination. Rather than inform NuCal of this fact, and thereby allow it to secure a safe supply and prevent tainted eggs from entering the food supply, defendants continued to sell eggs to NuCal in the ensuing weeks. It was only months later, after regulators informed defendants of an outbreak of Salmonella that eventually sickened roughly 1,500 people, that the defendants initiated recalls of the eggs they sold to NuCal and others.

3. As a result of defendants' misconduct, NuCal has suffered lost sales, reputational and economic harm, and other damages. NuCal also faces mounting claims from its retail customers and consumers.

4. NuCal files this suit for indemnification and recovery of its losses, and for damages to NuCal from the defendants' negligence and misconduct.

## JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. Section 1332, in that this is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of interests and costs, the sum of $75,000 either individually or jointly as to each defendant.

6. Venue is proper in this court pursuant to 28 U.S.C. Section 1391, as a substantial part of the events giving rise to the action occurred in this District, and a substantial part of the property that is the subject of the action is in this District.

## THE PARTIES

7.     Plaintiff NuCal is an agricultural cooperative with its principal place of business at 720 South Stockton Ave, Ripon, California.  NuCal processes over 7.5 million eggs per day from its 11 family farms and 7 processing plants in Northern California.  NuCal has been providing farm fresh eggs to retail and foodservice customers in Northern California for over 50 years.

8.     Defendant Quality Egg LLC ("Quality Egg") is an Iowa limited liability company with its principal place of business at 2674 Highway 69, Galt, Iowa.  At all times relevant hereto, Quality Egg, either directly or through its subsidiaries and related entities, was engaged in the business of manufacturing and selling shell eggs to wholesale and retail customers nationally.  On information and belief, Quality Egg is also the supplier of chickens and feed to the other defendants.  On information and belief, Austin "Jack" DeCoster ("DeCoster") owns Quality Egg either directly or through his ownership of other entities.

9.     Defendant Wright County Egg ("Wright County") is, on information and belief, an Iowa company that is a subsidiary of Quality Egg with its principal place of business at 2674 Highway 69, Galt, Iowa.  At all times relevant hereto, Wright County was engaged in the business of manufacturing and selling shell eggs to wholesale and retail customers nationally.  On information and belief, DeCoster owns Wright County either directly or through his ownership of other entities.

10.     Defendant Hillandale Farms of Iowa ("Hillandale") is an Iowa corporation with its principal place of business at 19 ½ West Main Street, New Hampton, Iowa.  At all times relevant hereto, Hillandale was engaged in the business of manufacturing and selling shell eggs to customers nationally.  On information and belief, one or more of Hillandale's Iowa farms were operated by Wright County during the relevant time period.  To the extent faulty eggs were sold from Hillandale farms operated by Wright County, each of Hillandale and Wright County acted as

an agent for the other, and is jointly and severally liable, with respect to the actions alleged with respect to those farms.

## GENERAL ALLEGATIONS

**I.   NuCal's Purchases From Defendants**

11.   Starting in late May 2010, NuCal purchased shell eggs from Wright County and Hillandale.  NuCal purchased these eggs in order to fill customer orders that NuCal could not fill with eggs from NuCal's own farmers.

12.   NuCal's purchases from Wright County and Hillandale were through the Egg Clearinghouse, Inc. ("ECI"), a commercial exchange.  After each ECI transaction, Wright County and/or Hillandale shipped the purchased eggs directly to NuCal's facilities in California.

13.   NuCal's first orders from Wright County and Hillandale were in late May 2010. Sometime before these orders, Wright County sent dozens of environmental samples from its farms to a lab for Salmonella testing.[1]  On May 27, 2010, the lab found that 66 of the samples tested positive for Salmonella.

14.   Neither Wright County nor Hillandale informed NuCal of these test results.  In the ensuing weeks, NuCal purchased additional millions of eggs from Wright County and Hillandale. During these transactions neither Wright County nor Hillandale disclosed the potential contamination of their eggs or the confirmed contamination of their facilities.  Nor did they make such disclosures after the transactions, or after their eggs were delivered to NuCal, or after NuCal began processing, packaging and shipping the tainted eggs to NuCal's customers.

---

[1] According to records released by the Congressional Committee on Energy and Commerce, Subcommittee on Oversight and Investigations (the "Congressional Subcommittee"), an entity known as "Decoster Farms of Iowa" sent samples from its farms to an Iowa State University lab for Salmonella testing on May 10, 2010.  On information and belief, these samples were from farms operated by Wright County.

15. NuCal's purchases from Wright County's Iowa farms totaled 272,310 dozens of shell eggs, including:

    a. 72,000 dozens shipped to NuCal's August facility on May 22, 25 and 28, 2010;

    b. 92,700 dozens packaged by Wright County into Lucerne™ brand cartons and shipped to NuCal's Denair facility on May 28 and 29, 2010;

    c. 23,400 dozens shipped to NuCal's Dwight Bell facility on June 18, 2010; and

    d. 84,210 dozens shipped to NuCal's Denair facility on July 2, 17 and 23, 2010.

16. NuCal's purchases from Hillandale's Iowa farms totaled 148,485 dozens of shell eggs, including:

    a. 25,200 dozens shipped to NuCal's Dwight Bell facility on May 25, 2010;

    b. 50,400 dozens shipped to NuCal's Hillmar Griffith facility on May 30, 2010;

    c. 24,285 dozens shipped to NuCal's August facility on July 12, 2010;

    d. 24,300 dozens shipped to NuCal's Hillmar Griffith facility on July 12, 2010; and

    e. 24,300 dozens shipped to NuCal's Hillmar Griffith facility on July 17, 2010;

17. In accordance with usual practice in the industry, NuCal sold the eggs it purchased from Wright County and Hillandale together with eggs from other sources. NuCal sold and distributed these eggs to several retail customers.

## II. The Recall

18. On July 26, 2010, another environmental sample from a Wright County farm tested positive for Salmonella. Wright County never informed NuCal of this test result.

19. On August 4, 2010, the lab that tested the July 26 sample identified the type of Salmonella found as Salmonella enteritidis ("SE"). Wright County never shared this information with NuCal.

20. On August 10, 2010, Quality Egg manager Tony Wasmund ("Wasmund") had a conference call with federal regulators. On information and belief, the call concerned an outbreak of SE, and included identification of the SE strain behind the outbreak. That same day Wasmund emailed veterinary advisor Charles Hofacre ("Hofacre") about the SE strain – Jegxo1.0004. Hofacre replied that Wasmund would have to educate regulators on "why we do certain things," and explain that "we stopped molting…because we feel that is the right thing to do once we realized we had SE." Again, Wright County did not share this information with NuCal.

21. Wright County did not announce a recall of its eggs until August 13, 2010. The initial recall was limited to certain farms, but Wright County later expanded the recall to include eggs from all of its Iowa farms.

22. Hillandale issued its own voluntary recall on August 20, 2010.

23. In all, the recalls involved approximately 550 million eggs produced by Hillandale and Wright County.

24. In response to these voluntary recalls, and in order to protect consumers from eggs that defendants had identified as tainted, NuCal announced its own recalls on August 17, 2010 (relating to Wright County eggs) and August 20, 2010 (relating to Hillandale eggs). Since then NuCal's retail customers have made demands on NuCal for recall-related refunds and expenses, and have taken credits against amounts due to NuCal to cover these refunds and expenses. NuCal's losses from such refunds and expenses have already exceeded $250,000.

25. NuCal also faces potential lawsuits from consumers who claim to have been sickened by the recalled eggs.

26. NuCal has also incurred its own internal costs in dealing with the recalled eggs. These costs have already exceeded $100,000.

27. NuCal further lost profits that it would have earned had the defendants not sold tainted eggs to NuCal.

28. As a result of defendants' conduct, NuCal also faces a loss of business for egg brands that it sold and that have now become associated with the defendants' negligent practices.

29. Defendants were well aware of the exposure that NuCal faced, but they nonetheless engaged in the practices described above, including failing to control Salmonella outbreaks, failing to inform customers and consumers of dozens of positive Salmonella tests at their farms, and delaying a recall despite knowing for weeks, and perhaps months, that their farms were contaminated with Salmonella.

### III.  Defendants Are Revealed As The Source Of The Salmonella Outbreak

30. In testimony before a Congressional panel on September 22, 2010, Peter DeCoster ("P. DeCoster"), Chief Operating Officer of Wright County, admitted that the SE outbreak was due to eggs sold by Wright County. P. DeCoster acknowledged that tests by the Food and Drug Administration ("FDA") in August 2010 "confirmed that Wright County Egg was producing eggs contaminated with SE."

31. During his testimony, P. DeCoster confirmed that the Hillandale farm operated by Wright County, the Hillandale Alden farm, also tested positive for SE contamination.

32. P. DeCoster also claimed that feed used by Wright County and Hillandale, and provided by Quality Egg, may have been the source of the Salmonella contamination.

33. At the September 22 hearing, Hillandale president Orland Bethel refused to testify after invoking his rights under the Fifth Amendment of the U.S. Constitution. Hillandale representative Duane Mangskau testified that Wright County ran Hillandale's Iowa operations,

and that Hillandale has "terminated our marketing relationship with" Wright County "because we were disappointed with the test results there."

## FIRST CLAIM FOR RELIEF

**(Breach of Implied Warranty of Merchantability)**
**(against all defendants)**
**(California Commercial Code § 2314)**

34. NuCal incorporates the allegations of Paragraph 1 through 33 above by reference as though fully set forth herein.

35. Under the California Commercial Code there is an implied warranty of merchantability for any goods sold. To be considered merchantable under the California Commercial Code, goods must be of fair average quality and must be fit for the ordinary purposes for which such goods are used, among other things.

36. Defendants breached this implied warranty because the eggs they sold to NuCal were not merchantable, in that defendants' eggs were not of fair average quality due to contamination with Salmonella and were not fit for the ordinary purpose for which they were to be used (i.e. human consumption) due to Salmonella contamination. Defendants' recall of the eggs, and their public admissions that defendants' farms were the source of the Salmonella outbreak, confirm the defendants' breach of the implied warranty.

37. As a result of defendants' breach, NuCal was forced to find alternative suppliers of eggs on short notice in order to cover its obligations to customers. NuCal also incurred, and continues to incur, other incidental and consequential costs related to the recalled eggs, including lost sales and increased labor costs, shipping costs, and overhead costs.

38. As a result of defendants' breach, NuCal's buyers have also made demands for credits for the recalled eggs, as well as claims for their incidental and consequential costs related to the recall, and NuCal has suffered losses as a result of these credits and other demands.

39. NuCal has also suffered losses to the extent it paid for eggs that were unmarketable, and has lost profits that it would have earned had the eggs been merchantable, which the defendants' own recall confirmed was not the case.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

**(Breach of Implied Warranty Of Fitness For Particular Purpose)**
**(against all defendants)**
**(California Commercial Code § 2315)**

40. NuCal incorporates the allegations of Paragraph 1 through 39 above by reference as though fully set forth herein.

41. Under the California Commercial Code there is an implied warranty of fitness for particular purpose when goods sold for a particular purpose.

42. When defendants sold their eggs, they were aware that the eggs were to be used for human consumption, and that contamination by Salmonella would render them unfit for human consumption. Defendants were also aware that the eggs were to be packaged for retail sale as unbroken shell eggs, and that a recall of the eggs, or a finding that the eggs were from farms with confirmed Salmonella contamination, would render them unfit for retail sale.

43. Defendants breached the implied warranty in that their eggs were not fit for human consumption due to Salmonella contamination. Defendants also breached the implied warranty in that their eggs were not fit for retail sale due to the fact that they were from farms with confirmed Salmonella contamination, and were in fact subject to a recall initiated by the defendants.

44. As a result of defendants' breach, NuCal has been forced to find alternative suppliers of eggs on short notice in order to cover its obligations to customers. NuCal has incurred other incidental and consequential costs related to the recalled eggs, including lost sales and increased labor costs, shipping costs, and overhead costs.

45.     As a result of defendants' breach, NuCal's buyers have also made demands for credits for the recalled eggs, as well as claims for their incidental and consequential costs related to the recall, and NuCal has suffered losses as a result of these credits and other demands.

46.     NuCal has also suffered losses to the extent it paid for eggs that were not fit for human consumption or for retail sale, and has lost profits that it would have earned had the eggs been fit for their intended purpose, which the defendants' own recall confirmed was not the case.

WHEREFORE, Plaintiff prays for relief as set forth below.

## THIRD CLAIM FOR RELIEF

### (Fraud) (against defendants Quality Egg and Wright County)

47.     NuCal incorporates the allegations of Paragraph 1 through 46 above by reference as though fully set forth herein.

48.     Defendants Quality Egg and Wright County sold eggs to NuCal that defendants knew were intended for retail sale and human consumption, and that were sold with an implied warranty of fitness for these particular uses.  Defendants Quality Egg and Wright County also knew that NuCal, like any buyer, was only purchasing defendants' eggs on the basis of the implied warranty that the eggs were merchantable.  As such, defendants Quality Egg and Wright County had a duty to disclose to NuCal that defendants' eggs were not in fact merchantable, and were not in fact fit for retail sale or human consumption.

49.     Quality Egg and Wright County received reports in late May 2010 that dozens of environmental samples from their Iowa farms had tested positive for Salmonella.  Quality Egg and Wright County did not disclose this information to NuCal, either before their sales to NuCal, before their delivery of eggs to NuCal, or after their delivery of eggs to NuCal.

50.     On or around July 26, 2010, Quality Egg and Wright County received a report that another environmental sample from one of their Iowa farms had tested positive for Salmonella.

Quality Egg and Wright County did not disclose this information to NuCal, despite the fact that some of NuCal's recent purchases from defendants could have included eggs from this farm.

51. On or around August 4, 2010, Quality Egg and Wright County received a report that the recent Salmonella found at one of their farms was SE. Quality Egg and Wright County did not disclose this information to NuCal, despite the fact that some of NuCal's recent purchases from defendants could have included eggs from this farm.

52. Quality Egg and Wright County failed to disclose problems at their farms to NuCal because they knew that NuCal would have stopped purchasing from defendants, would have insisted on a recall, and would have insisted on a refund for any unsold tainted eggs. By their omission, Quality Egg and Wright County intended to prevent NuCal from discovering the true state of affairs, and from taking actions that would have resulted in losses to defendants.

53. NuCal relied on Quality Egg and Wright County's nondisclosure of the true state of affairs, including the results of Salmonella tests and the presence of Salmonella contamination at defendants' farms, when NuCal purchased, received, shipped and sold defendants' eggs. NuCal's reliance was justified in that NuCal was not made aware of the true state of affairs.

54. As a result of its reliance NuCal suffered damages that include lost sales, lost profits, recall-related administrative costs, and the loss of goodwill and reputation for the brands subject to the recall. NuCal's buyers have also made demands for credits for the recalled eggs, as well as claims for their incidental and consequential costs related to the recall, and NuCal has suffered losses as a result of these credits and other demands.

55. Quality Egg and Wright County's omissions were intentional, malicious, oppressive, or fraudulent, and give rise to liability for exemplary and punitive damages according to proof at trial. Quality Egg and Wright County each authorized and/or ratified the wrongful conduct upon which its liability is based, or was personally guilty of oppression, fraud or malice.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Negligence) (against all defendants)

56. NuCal incorporates the allegations of Paragraph 1 through 55 above by reference as though fully set forth herein.

57. Defendants owed a duty of care to NuCal in that it sold goods to NuCal that it knew were intended for resale.

58. Defendants breached their duty to NuCal by selling eggs to NuCal from farms with confirmed Salmonella outbreaks, and by failing to inform NuCal of the results of Salmonella testing. Defendants Quality Egg and Wright County further breached their duty by operating one or more farms for Hillandale with confirmed Salmonella outbreaks, and by failing to inform NuCal of the results of Salmonella testing at that farm or farms.

59. Defendants' breaches caused damages to NuCal, including, among other things, lost sales, lost profits, recall-related administrative costs, and the loss of goodwill and reputation for the brands subject to the recall. NuCal's buyers have also made demands for credits for the recalled eggs, as well as claims for their incidental and consequential costs related to the recall, and NuCal has suffered losses as a result of these credits and other demands.

60. NuCal's losses were reasonably foreseeable to defendants in that it was reasonable to expect that defendants' sale of tainted eggs, their recall of tainted eggs, and their public disclosure of their failure to control Salmonella contamination and timely inform consumers of that contamination, would cause the losses suffered by NuCal.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Equitable Indemnification) (against all defendants)

61. NuCal incorporates the allegations of Paragraph 1 through 60 above by reference as though fully set forth herein.

62. As described above, NuCal contracted with defendants for the purchase and delivery of safe and marketable eggs that were fit for human consumption and retail sale. Defendants delivered eggs that were not safe or marketable, or fit for human consumption or retail sale.

63. As a result of defendants' conduct, NuCal's customers have demanded credits or other payment from NuCal for their direct, incidental and consequential costs and losses related to the recall, and NuCal has suffered losses as a result of these credits and other demands. NuCal has also suffered its own recall-related costs, including increased labor costs, shipping costs, regulatory costs and other overhead costs.

64. NuCal is entitled to full or partial equitable indemnification from defendants for both third party losses and costs and NuCal's own losses and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SIXTH CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Advantage) (against all defendants)

65. NuCal incorporates the allegations of Paragraph 1 through 64 above by reference as though fully set forth herein.

66. At the time of the events described above, NuCal had an economic relationship with its retail customers.

67. Defendants knew that they were selling eggs to distributors who, like NuCal, would repackage those eggs under different brand names and sell them to downstream retailers. This state of affairs was confirmed when NuCal was revealed as the winning bidder for the defendants'

eggs, as NuCal is known as an entity that buys bulk eggs on the open market to augment its own farmers' supplies and then repackages those eggs under different brand names.

68. As described above, defendants were negligent in failing to control Salmonella on their farms, selling tainted eggs despite their knowledge of the high risk of Salmonella contamination in those eggs, and failing to timely inform customers and consumers of the risk of Salmonella in their eggs. The result of defendants' acts was a series of voluntary recalls, widespread news coverage of the defendants' practices, and consumer panic over egg safety.

69. NuCal has suffered lost future business and sales from customers who have blamed NuCal for the disruption, loss of goodwill and food safety panic that resulted from the defendants' negligence and misconduct, or who have associated NuCal and NuCal's brands with the defendants' negligence and misconduct. For these losses NuCal seeks compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF

### (Unfair Competition) (against all defendants)

70. NuCal incorporates the allegations of Paragraph 1 through 69 above by reference as though fully set forth herein.

71. California Business and Professions Code Section 17200 et seq., the Unfair Competition Law, prohibits unfair competition, which includes any unlawful, unfair and/or fraudulent acts or practices and any unfair, deceptive, untrue or misleading advertising.

72. Defendants' unlawful, unfair and/or fraudulent acts, described in Paragraphs 1 through 69 above, include breaches of the implied warranties of merchantability and fitness for particular purpose, fraud, negligence, and failure to timely inform customers and consumers of the high risk of Salmonella contamination in their products.

73. NuCal has suffered actual injury and has lost money or property by virtue of defendants' unlawful, unfair and/or fraudulent acts in that NuCal has suffered monetary losses and has paid for unmerchantable and unfit goods.

74. NuCal seeks an order restoring to it any money or property, real or personal, which defendants may have acquired by means of the unfair competition described herein.  This includes, at a minimum, all payments made by NuCal and received by the defendants for the recalled eggs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, NuCal prays for judgment as follows:

1. For damages equal to NuCal's lost profits, the amounts NuCal paid for the recalled eggs, NuCal's administrative costs of the recall, costs of refunds and payments to NuCal customers due to the recall, and for other incidental and consequential damages according to proof at trial;

2. For punitive and exemplary damages according to proof at trial;

3. For indemnification of NuCal for the claims of its customers who purchased the recalled eggs, for claims by consumers who purchased the recalled egg brands, and for other recall-related costs borne by NuCal;

4. For economic damages due to defendants' interference with NuCal's prospective economic advantage, including lost profits and loss of goodwill;

5. For a declaration that NuCal is entitled to full indemnification for any damages, settlements, compromises, judgments or other payments paid by NuCal related to the tainted and recalled eggs;

6. For restitution to NuCal of any money or property, real or personal, which defendants may have acquired by means of their unfair competition; and

7. For attorney's fees, costs, and such other and further relief as the court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff NuCal hereby demands a trial by jury on all issues so triable.

DATED: November 18, 2010

By:   /s/ William M. Goodman
      William M. Goodman

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
William M. Goodman (SBN 61305)
101 California Street, Suite 2300
San Francisco, CA 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

Attorneys for Plaintiff NUCAL FOODS INC.