1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10    NUCAL FOODS, INC.,

11            Plaintiff,                    No. CIV S-10-3105 KJM-CKD

12        vs.

13    QUALITY EGG LLC; et al.,

14            Defendants.                    <u>ORDER</u>

15    _____/

16            This matter comes before the court on the motion to dismiss for lack of personal

17    jurisdiction under Federal Rule of Civil Procedure 12(b)(2) filed by defendants Environ/Wright

18    County, Inc. ("Environ"), DeCoster Enterprises, LLC ("DeCoster Enterprises") and the DeCoster

19    Revocable Trust's ("Trust") (collectively, "entity defendants").  (ECF 71.)  Also before the court

20    is the motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure

21    12(b)(2) by individual defendant Austin Jack DeCoster's ("DeCoster").  (ECF 73.)  This matter

22    was decided without a hearing in accordance with Local Rule 230(g).  For the following reasons,

23    defendants' motions are GRANTED.

24    /////

25    /////

26    /////

I.   FACTUAL BACKGROUND

Plaintiff filed its complaint on November 18, 2010, against three defendants - Quality Egg LLC ("Quality Egg"), Wright County Egg and Hillandale Farms of Iowa, Inc. ("Hillandale") - alleging seven claims: (1) breach of implied warranty of merchantability against all defendants; (2) breach of implied warranty of fitness for particular purpose against all defendants; (3) fraud against Quality Egg and Wright County; (4) negligence against all defendants; (5) equitable indemnification against all defendants; (6) negligent interference with prospective economic advantage against all defendants; and (7) unfair competition against all defendants.  (ECF 1.)  Quality Egg filed its answer on December 14, 2010 (ECF 9), and Hillandale filed its answer on February 14, 2010 (ECF 24).

On January 27, 2012, the court granted plaintiff's motion to modify the pretrial scheduling order and file an amended complaint.  (ECF 60.)  On January 30, 2012, plaintiff filed its first amended complaint ("FAC"), adding defendants Environ, the Trust, DeCoster Enterprises and DeCoster.  (ECF 61.)  The FAC makes the same claims as the original complaint, and also contains numerous additional allegations, and an additional claim for breach of express warranty against all defendants.  (*See generally id.*)

A.      Threshold Evidentiary Issues

Plaintiff requests that the court take judicial notice of the following documents: (1) "Plaintiffs' Resistance To Defendants' Request For Modification Of Temporary Injunction And/Or Increase In Bond, filed May 23, 2011, in *Austin J. DeCoster and Quality Egg LLC v. Boomsa's Inc. and John W. Glessner*, Case No. LACV081-026 (Iowa District Court for Hardin County)"; (2) "Affidavit In Support Of Available Funds To Preform [sic] Under Option, filed May 23, 2011, in *Austin J. DeCoster and Quality Egg LLC v. Boomsa's Inc. and John W. Glessner*, Case No. LACV081-026 (Iowa District Court for Hardin County)"; (3) "Affidavit In Support Of Available Funds To Preform [sic] Under Option, filed May 23, 2011, in *Austin J. DeCoster and Quality Egg LLC v. Boomsa's Inc. and John W. Glessner*, Case No.

2

1   LACV081-026 (Iowa District Court for Hardin County)"; (4) "Petition At Law, filed April 9,

2   2007, in *A.J. DeCoster d/b/a/ Wright County Egg v. Kelly C. Silvey*, Case No. LACV022734

3   (Iowa District Court in and for Wright County)"; (5) "Answer And Affirmative Defenses, filed

4   October 23, 2007, in *Inland Paperboard and Packaging Inc., f/b/a Tin, Inc. and*

5   *Temple-Inland v. A.J. DeCoster, d/b/a Wright County Egg Production*, Case No. LACV022734

6   (Iowa District Court in and for Wright County)."   (*See generally* Pl.'s Request for Judicial

7   Notice ("RJN"), filed April 13, 2012, ECF 98.)   Plaintiff argues that the court may properly take

8   judicial notice of these documents because they are "documents filed in other court proceedings"

9   that "are publicly available from the state courts of Iowa."   (*Id.* at 2:2124.)   Moreover, plaintiff

10  maintains that it "asks the [c]ourt to take judicial notice of the representations made by the

11  parties in these documents, and not for the truth of those representations."   (*Id.* at 3:10-12.)

12          Defendant DeCoster objects to plaintiff's request, arguing that the documents are

13  beyond the scope of judicial notice under Federal Rule of Evidence 201.   (*See* Def.'s Resp. to

14  Pl.'s Req. for Judicial Notice, filed April 20, 2012, ECF 112 at 2:26-3:2.)   Specifically,

15  defendant maintains that "[p]laintiff's five exhibits are from cases that have no direct relation to

16  the matters at issue," and thus, judicial notice is improper.   (*Id.* at 3:21-22.)   Moreover, defendant

17  maintains that plaintiff improperly "asks the [c]ourt to accept its own opinion of how these

18  documents should be interpreted."   (*Id.* at 3:23-24.)

19          Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that

20  is not subject to reasonable dispute because it can be accurately and readily determined from

21  sources whose accuracy cannot reasonably be questioned."   FED. R. EVID. 201.   Courts have

22  consistently held that courts may take judicial notice of documents filed in other court

23  proceedings.   *See Schulze v. FBI*, 2010 WL 2902518, at *1 (E.D. Cal. July 22, 2010) (quoting

24  *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) ("A federal court may 'take notice of

25  proceedings in other courts, both within and without the federal judicial system, if those

26  proceedings have a direct relation to matters at issue.'"); *Cartmill v. Sea World*, 2010 WL

1   4569922, at *1 (S.D. Cal. Nov. 5, 2010) (taking judicial notice of documents filed in other court

2   proceedings).  While the court cannot accept the veracity of the representations made in the

3   documents, it may properly take judicial notice of the existence of those documents and of the

4   "representations having been made therein."  *San Luis Unit Food Producers v. United States*,

5   772 F.Supp.2d 1210, 1216 n.1 (E.D. Cal. 2011).

6              In this case, the court may properly take judicial notice of the documents filed in

7   the related Iowa state court proceedings involving DeCoster and Quality Egg.  While the court

8   cannot and does not accept the representations therein as true, it may take judicial notice of the

9   fact that the representations were made in determining whether plaintiff has made a *prima facie*

10  showing that defendants are subject to personal jurisdiction in California.  As such, plaintiff's

11  request for judicial notice is granted in its entirety.

12          B.      Facts

13                  1.      The FAC

14              In August 2010, defendants Quality Egg and Hillandale[1] initiated a recall of shell

15  eggs they previously distributed after an outbreak of Salmonella.  (FAC, ECF 61 ¶ 1.)

16  According to plaintiff, "defendants continued to sell eggs from contaminated farms, and from

17  contaminated hens" after discovering the infection and without warning  regulators, egg

18  consumers or egg purchasers.[2]  (*Id.* ¶ 9.)  According to the FAC, plaintiff NuCal Foods, Inc.

19  ("NuCal") is a farming cooperative based in California that purchased the allegedly tainted eggs

20  from March 2010 to July 2010.  (*Id.* ¶ 21.)

21  /////

22

23          [1] Quality Egg and Hillandale concede that they are subject to personal jurisdiction.

24          [2] In its complaint, plaintiff does not distinguish the specific acts of each individual
    defendant; instead, plaintiff lumps the defendants together as if they were each involved in every
    allegation contained in the complaint by simply labeling them the "DeCoster defendants."  For
25  example, plaintiff alleges that "executives from the defendants' companies testified . . . before
    the U.S. House of Representatives . . . about the recall.  (FAC ¶ 17.)  Plaintiff does not, however,
26  state which executives from which companies testified.

1   Plaintiff alleges that Quality Egg, an Iowa limited liability company, was engaged

2   in the business of producing and selling eggs and "operated layers 1, 2, 3, 4 and 6" while

3   operating layers 5 and 9 with Hillandale. (*Id.* ¶ 26.) Plaintiff alleges that the Trust, "[o]n

4   information and belief, . . . owned and/or controlled Quality Egg during the relevant period."

5   (*Id.* ¶ 27.) The complaint states that DeCoster is an Iowa resident who is the trustee of the Trust,

6   has "ultimate authority over Quality Egg's Iowa operations, and was aware of [Salmonella]

7   contamination at Iowa farms." (*Id.* ¶ 28.) Plaintiff alleges that DeCoster Enterprises is a

8   Delaware limited liability company located in Iowa that "controlled and/or managed the

9   DeCoster trust during the relevant period." (*Id.* ¶ 29.) Finally, according to the complaint,

10  Environ is an Iowa corporation, located in the same office as DeCoster Enterprises and Quality

11  Egg, that "was involved in the processing and sale of the recalled eggs from one or more of the

12  Iowa farms." (*Id.* ¶ 30.)

13       Together, plaintiff maintains that these defendants "were part of a unified egg

14  farming enterprise." (*Id.* ¶ 31.) Moreover, plaintiff maintains that when these defendants

15  operated, they "used the fictitious business name 'Wright County Egg,'" through which they

16  produced eggs "in facilities owned by one or more of the DeCoster [d]efendants from chickens

17  raised by one of more" of the "DeCoster defendants." (*Id.* ¶ 32.) Plaintiff asserts that "the

18  DeCoster [d]efendants shared common ownership, managers and interests," and that "each of the

19  DeCoster [d]efendants w[ere] the agent of each of the other DeCoster [d]efendants with respect

20  to the misconduct alleged" in the FAC. (*Id.* ¶ 24.)

21       Plaintiff alleges that it purchased from defendants a number of eggs through the

22  Egg Clearinghouse, which defendants later shipped to its facilities in California, or to its retail

23  customers. (*Id.* ¶¶ 78-79.) According to the complaint:

24       The listed counterparties to NuCal's purchases were "Wright
         County Egg Production" and "Hillandale Farms of PA, Inc."
25       However, other defendants were directly involved in these
         transactions. NuCal's purchases from "Wright County Egg" were
26       shipped from either "DeCoster Egg Farms of Iowa" or "Quality

5

1   Egg," and in some cases the invoices were remitted to Environ.
    Other DeCoster [d]efendants were involved through their
2   ownership and management of other DeCoster [d]efendants or
    through their direct supervision of Iowa farm operations.  NuCal's
3   purchases from Hillandale PA were processed by Hillandale Farms
    LLC and were shipped from Hillandale Farms in Alden, Iowa.
4   When the recalls were announced, the entities announcing the
    recalls were "Wright County Egg" and Hillandale Farms, not
5   Quality Egg and Hillandale PA.

6   (*Id.* ¶ 80.)

7          Plaintiff alleges that, "despite widespread and ongoing Salmonella Heidelberg

8   contamination at Midwest Hatchery's facilities and FDA warnings about the dangers posed by

9   Salmonella Heidelberg, Quality Egg and DeCoster Farm of Iowa[3] continued to purchase

10  chickens of Midwest Hatchery."  (*Id.* ¶ 66.)   Specifically, plaintiff maintains that when NuCal

11  purchased eggs in 2010, "defendants knew about widespread contamination at the farms," yet,

12  "[n]either the DeCoster [d]efendants acting as 'Wright County Egg' nor the 'Hillandale

13  Defendants' informed Nucal" of the contamination.  (*Id.* ¶¶ 82-83.)  "Nor did [defendants] make

14  such disclosures after the transactions, or after their eggs were delivered to NuCal, or after

15  NuCal began processing packaging and shipping the tainted eggs to NuCal's customers" in

16  California.  (*Id.* ¶ 83.)  Of the 397,575 dozens of eggs defendants shipped to NuCal's California

17  facilities "Wright County Egg" recalled 272,310.  (*Id.* ¶ 90.)

18          2.     Plaintiff's Evidence in Support of Jurisdiction

19          Plaintiff argues that its amended complaint attaches exhibits showing, among

20  other things, that: "(1) Before the recall in 2010, 'DeCoster farms of Iowa' was the entity that

21  submitted samples to Iowa State University that were found to be contained with [Salmonella]";

22  and (2) "'Wright County Egg,' not Quality Egg LLC, was the entity named in the recall notices."

23  (*See* Pl.'s Opp'n to Entity Defs.' Mot. ("ECF 94") at 4:3-12 (citing FAC, Exs. 2, 19).)  Plaintiff

24  also attaches an "organizational chart" to the FAC, which purports to demonstrate defendants'

25  ――――――――――――――

26      [3] Plaintiff alleges that "[d]efendants also used the business names 'DeCoster Farms of
    Iowa' and 'DeCoster Farms' to refer to their unified farming operation."  (*Id.* ¶ 33.)

interconnected relationships.  (FAC, Ex. 9.)  Specifically, "[t]he spreadsheet shows that DeCoster Enterprises either owns or is owned by the DeCoster Revocable Trust, and that the DeCoster Revocable Trust owns Quality Egg."  (ECF 94 at 4:10-12.)

After defendants filed their motions, plaintiff took the depositions of DeCoster Trust, DeCoster Enterprises and Quality Egg "on a limited set of topics related to personal jurisdiction."  (*Id.* at 4:23-24.)  "DeCoster Trust, DeCoster Enterprises, and Quality Egg all designated the same individual - attorney William Smith - to testify at the deposition."[4]  (*Id.* at 4:27-51.)  Plaintiff offers the following from that deposition: Quality Egg is the "operational arm of DeCoster operations in Iowa"; "Quality Egg admitted that it operated using trade names that had also been used by Jack DeCoster in his personal capacity, and that Quality Egg was formed to help Jack DeCoster reduce his personal liability and simplify estate planning"; and that "Quality Egg, DeCoster Enterprises, DeCoster Trust and Jack DeCoster engaged in a series of loan and credit agreements whereby they would cross-guarantee loans to be used for Iowa egg farm operations."  (Pl.'s Opp'n to DeCoster's Mot. ("ECF 95"), at 13:7-15 (citing Smith Depo. at 31:24-33:18; 50:7-53:11; 92:4-95:3; 114:12-116:5).)

3.     Defendants' Evidence in Support of Motion to Dismiss

In support of their motion to dismiss, the entity defendants proffer the declaration of Peter DeCoster, the Chief Operating Officer of Quality Egg.[5]  (*See* Decl. of Peter DeCoster ("DeCoster Decl."), ECF 71-1.)  According to the declaration, neither  Environ, the Trust nor DeCoster Enterprises had any involvement in the production or sale of eggs to NuCal by Quality Egg, and Environ merely "owned the land and building at the 'Environ' farm level (Layer six)

---

[4] The entity defendants filed William Smith's deposition on the docket on August 6, 2012.  (*See* Amended Decl. of Troy McMahon, ECF 155, Ex. 1.)  The court cites to the deposition as the "Smith Depo."

[5] Plaintiff objects that the declaration of Peter DeCoster lacks foundation.  (ECF 94 at 14:16-24.)  The objection is overruled to the extent DeCoster, as Chief Operating Officer of Quality Egg, testifies as to who was, and who was not, involved with the production and sale of eggs by Quality Egg.

1   which it leased to Quality Egg."  (*Id.* ¶¶ 5, 7.)  Moreover, the entity defendants did not own or

2   control Environ, nor did Environ own or control them.  (*Id.* ¶ 6.)  DeCoster further avers that

3   Quality Egg has never been authorized to act as an agent for the other defendants; indeed,

4   Quality Egg is a completely separate legal entity from the entity defendants, which "always has

5   maintained its own bank accounts."  (*Id.* ¶¶ 3-4.)  Finally, according to DeCoster's declaration,

6   "[d]uring the time periods relevant to this lawsuit, [Environ] did not share any employees,

7   managers or directors with Quality Egg, DeCoster Revocable Trust or DeCoster Enterprises."

8   (*Id.* ¶ 9.)

9   II.   LEGAL STANDARDS APPLICABLE TO MOTION TO DISMISS FOR LACK OF
      PERSONAL JURISDICTION (FED. R. CIV. P. 12(b)(2))

10

11          The party seeking to invoke the federal court's jurisdiction bears the burden of

12   demonstrating jurisdiction. *Pebble Beach Company v. Caddy*, 453 F.3d 1151, 1154

13   (9th Cir. 2006); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285

14   (9th Cir. 1977).  When resolving a motion to dismiss under Rule 12(b)(2) on written materials,

15   the court accepts uncontroverted facts in the complaint as true and resolves conflicts in affidavits

16   in plaintiff's favor.  *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1223

17   (9th Cir. 2011); *Doe v. Unocal Corporation*, 248 F.3d 915, 922 (9th Cir. 2001).  It is "well

18   established that where the district court relies solely on affidavits and discovery materials, the

19   plaintiff need only establish a prima facie case of jurisdiction."  *Rano v. Sipa Press, Inc.*, 987

20   F.2d 580, 587 n.3 (9th Cir. 1993).  In a similar vein, "when reviewing motions to dismiss" for

21   lack of personal jurisdiction, the court "must 'accept all factual allegations [in] the complaint as

22   true and draw all reasonable inferences in favor of the nonmoving party.'"  *See Western Center*

23   *for Journalism v. Cederquist*, 235 F.3d 1153, 1154 (9th Cir. 2000) (quoting *Tworivers v. Lewis*,

24   174 F.3d 987, 991 (9th Cir.1999)).

25          While the court reviews motions to dismiss for lack of personal jurisdiction in the

26   light most favorable to the non-moving party, "when there is a conflict between the complaint

8

and an affidavit, plaintiff cannot rely solely on the complaint to establish jurisdictional facts." *North American Lubricants Co. v. Terry*, 2012 WL 1108918, at *4 (E.D. Cal. Apr. 2, 2012) (citing *Data Disc, Inc.*, 557 F.2d at 1284). In addition, the court need not consider merely conclusory claims, or legal conclusions in the complaint as establishing jurisdiction. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *China Technology Global Corp. v. Fuller, Tubb, Pomeroy & Stokes*, 2005 WL 1513153, at *3 (N.D. Cal. June 27, 2005). If the court considers only written materials, plaintiff must show facts, which if true, would establish personal jurisdiction over defendants. *Mattel, Inc. v. Greiner and Hausser GMBH*, 354 F.3d 857, 862 (9th Cir. 2003); *Data Disc*, 557 F.2d at 1285.

Questions of personal jurisdiction ultimately turn on concepts of due process. "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment*, 326 U.S. 310, 315 (1945) (internal quotations omitted). When no federal statute authorizes personal jurisdiction, this court must apply California law. As California's long arm statute is coextensive with federal due process requirements, the jurisdictional analysis is the same. *Mavrix Photo Inc. v. Brand Technologies,* 647 F.3d 1218, 1223 (9th Cir. 2011), *cert. denied,* ___ U.S. ___, 132 S.Ct. 1101 (2012); CAL. CIV. PROC. CODE § 410.10.

The "constitutional touchstone" of specific jurisdiction[6] is "whether the defendant purposefully established 'minimum contacts' in forum State," and the plaintiff's claim arose out of those contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). The Ninth Circuit has devised a three-part test for analyzing claims of personal jurisdiction:

---

[6]     Plaintiff does not assert that defendants' contacts with California are so systematic and continuous such that defendants are subject to suit in California under the doctrine of general jurisdiction.

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protects of its laws; (2) the claim must be one which arises out of or relates to defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice; i.e. it must be reasonable.

*Mavrix Photo*, 647 F.3d at 1227-28 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (in turn quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)) (emphasis in original). The "purposeful direction" doctrine in turn relies on the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984), which requires that "'the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Mavrix Photo*, 647 F.3d at 1228 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)).

Generally, the "purposeful availment" analysis is used for cases sounding in contract while the "purposeful direction" analysis applies to cases sounding in tort. *Pebble Beach*, 453 F.3d at 1155; *see Richmond Technologies, Inc. v. Aumtech Business Solutions, Inc.*, 2011 WL 2607158 at *4 (N.D. Cal. July 1, 2011) (applying the purposeful availment test exclusively when the tort claims arose out of the contractual relationship between the parties).

III.   ANALYSIS

Defendants maintains that plaintiff has failed to present evidence or make factual allegations sufficient to establish a *prima facie* case that defendants have performed any act that would subject them to personal jurisdiction in California.  Plaintiff counters that the factual allegations, as set forth above, in combination with documents from the Iowa state court action, "support at least an inference that Jack DeCoster [and the entity defendants] w[ere] directly involved in the operations of the Iowa farms and in the eggs sales to NuCal," and thus, are subject to personal jurisdiction.  (ECF 95 at 1:15-17.)  Even if this evidence does not create an

1  inference of direct involvement in the sale of eggs to NuCal in California, plaintiff argues that

2  the factual allegations and evidence in opposition to defendants' motions create at least a

3  reasonable inference that defendants are subject to personal jurisdiction under either an alter ego,

4  or agency theory.  (*See generally id.*)

5        A.      Entity Defendants' Motion

6              1.     Purposeful Availment

7              The entity defendants contend that plaintiff has not alleged any facts

8  demonstrating that they "purposefully directed" their activities toward the forum or purposefully

9  availed themselves of the benefits of doing business in the forum.  Rather, defendants maintain,

10 it was Quality Egg and Hillandale that produced, sold and delivered the eggs to California.

11 Specifically, while the FAC alleges that the Trust owned Quality Egg, mere ownership of the

12 company that is subject to personal jurisdiction in the forum is insufficient to confer the court

13 with personal jurisdiction over the Trust absent allegations or evidence that the Trust

14 purposefully availed itself of the benefits of conducting business in the forum.  (Entity Defs.'

15 Mot. ("ECF 71") at 9:10-15.)  With regard to DeCoster Enterprises, defendants maintain that the

16 alleged act of controlling and/or managing the Trust and Quality Egg - "at best, two steps

17 removed from the only entity alleged to have directed activities toward California - is not a

18 'purposeful availment.'"[7] (*Id.* at 9:16-23.)  Defendants argue that, even if the entities have a

19 parent-subsidiary relationship, or some other interrelated relationship, "the mere existence of a

20 parent-subsidiary relationship is not sufficient to confer personal jurisdiction over the parent

21 based on the subsidiaries' forum contacts"; rather, plaintiff must demonstrate how each

22 individual defendant purposefully availed itself of the benefits of conducting business in the

23 forum. (*Id.* at 10:6-9.)

24

---

25        [7] Plaintiff's allegation that DeCoster Enterprises controlled and/or managed the trust is
   belied by Smith's deposition, which provides that it simply acted as a central bank for various
26 DeCoster entities.  (Smith Depo. at 22:16-18.)

11

1    Plaintiff counters that the factual "allegations describe how DeCoster Enterprises,

2  DeCoster Trust and Environ/Wright [were] each part of a consolidated farming enterprise that

3  included every aspect of egg production, from raising pullets to operating laying houses to

4  processing, marketing and selling eggs, how this consolidated enterprise used the trade name

5  'Wright County Egg' when dealing with outsiders, and how this consolidated enterprise sold the

6  [Salmonella]-tainted eggs to NuCal." (ECF 94 at 7:7-13 (internal citations omitted).). In

7  support of this theory, plaintiff alleges that Environ "was involved in the processing and sale of

8  the recalled eggs" and that "NuCal invoices were remitted directly back to Environ/Wright." (*Id.*

9  at 7:14-16.) Plaintiff submits evidence that demonstrates "'DeCoster Farms' - not Quality Egg -

10 submitted environmental and carcass samples to Iowa State University for testing and how all

11 the DeCoster entities were linked to the DeCoster trust." (*Id.* at 7:17-24 (citing FAC, Exs. 2, 9).)

12 Based on these allegations, plaintiff maintains the court can infer that the entity defendants were

13 somehow involved in the sale of the tainted eggs to California, and thus, sufficiently availed

14 themselves of the forum's benefits, such that the court constitutionally can exercise personal

15 jurisdiction over them.

16    As set forth above, in order to survive dismissal, plaintiff must make a *prima*

17 *facie* showing that each entity defendant purposefully availed itself of the benefit of doing

18 business in the forum. As enunciated by the Ninth Circuit:

19       Purposeful availment analysis examines whether the defendant's
         contacts with the forum are attributable to his own actions or are
20       solely the actions of the plaintiff. In order to have purposefully
         availed oneself of conducting activities in the forum, the defendant
21       must have performed some type of affirmative conduct which
         allows or promotes the transaction of business within the forum
22       state.

23 *Sinatra v. National Enquirer*, 854 F.2d 1191, 1195 (9th Cir. 1988) (citations omitted). This

24 requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of

25 random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third

26 person." *Burger King*, 471 U.S. at 475 (citations and quotation marks omitted).

12

1              Here, even if plaintiff's allegation that the entity defendants were a "consolidated

2    farming enterprise that included every aspect of egg production" was true, that is not enough to

3    demonstrate that each separate entity was actually involved in the sale and delivery of the

4    allegedly tainted eggs by Quality Egg to NuCal in California.  The fact that DeCoster Farms, not

5    Quality Egg, "submitted environmental and carcass samples to Iowa State University for testing"

6    is insufficient to demonstrate that either DeCoster Enterprises or the Trust were in any way

7    involved in the sale and distribution of the tainted eggs to California.  Plaintiff has not produced

8    evidence or sufficiently alleged that either DeCoster Enterprises or the Trust "performed some

9    type of affirmative conduct which allows or promotes the transaction of business within the

10   forum state"; that is, that those specific defendants were involved in the distribution of the

11   tainted eggs to California.  *Sinatra*, 854 F.2d at 1195.  Rather, plaintiff groups these defendants

12   together as the "DeCoster Defendants," without describing how each defendant had any contact

13   with the forum that promoted a business transaction to their benefit.  Plaintiff has not shown that

14   the Trust or DeCoster Enterprises is subject to personal jurisdiction under the traditional due

15   process test.

16             As to Environ, plaintiff maintains that the allegation that "in some cases, the

17   invoices [from NuCal's purchases] were remitted to Environ" is sufficient for the court to

18   reasonably infer that Environ purposefully availed itself of the benefits of conducting business in

19   the forum.  (FAC ¶ 80.)  Plaintiff's allegations, however, are expressly contradicted by

20   defendants' evidence.  Peter DeCoster's declaration states that "[d]uring the time periods

21   relevant to this lawsuit, Environ/Wright County Inc., did not have any involvement in production

22   or sale of shell eggs, and did not have any involvement of the sale of shell eggs to NuCal Foods,

23   Inc." (DeCoster Decl. ¶ 7.)  In his deposition, Smith testified that, even if there was an invoice

24   that said "remit to" Environ, "Environ/Wright County, Inc., couldn't be involved in" the sale.

25   (Smith Depo. at 132:13-25.)  Here, because plaintiff's allegation is expressly contradicted by the

26   evidence of record, the court cannot reasonably infer that Environ purposefully availed itself of

1  the benefits of doing business in the forum such that it is subject to specific jurisdiction. *Terry*,

2  2012 WL 1108918, at *4 ("When there is a conflict between the complaint and an affidavit,

3  plaintiff cannot rely on the complaint to establish jurisdictional facts.").

4          The court here cannot "hale[] [defendants] into [this] jurisdiction solely as a result

5  of the unilateral activity of another part" - Quality Egg. *Burger King*, 471 U.S. at 475.  Plaintiff

6  has not satisfied the purposeful availment prong of the Ninth Circuit's test for specific

7  jurisdiction, and has not made a *prima facie* showing of personal jurisdiction over the entity

8  defendants.

9                    2.       Alter-Ego Theory

10          Plaintiff alternately tries to establish personal jurisdiction over the entity

11  defendants through an "alter ego" theory of liability.  Defendants maintain plaintiff also has

12  failed to present a *prima facie* case for personal jurisdiction under this theory.  Defendants argue

13  that plaintiff has not pled facts sufficient to establish any "unity or interest of ownership"

14  between the entities or that "any fraud or injustice would result if NuCal were forced to continue

15  litigating its claims regarding Quality Egg's recall (as it has from the outset) solely against

16  Quality Egg" and Hillandale.  (ECF 71 at 11:19-12:10.)

17          Plaintiff counters that its alter ego theory is viable because "NuCal's complaint

18  alleges that [the entity defendants] were each part of a single consolidated enterprise that

19  operated the Iowa farms, that the enterprise used a variety of trade names as part of its

20  operations, and that the different" DeCoster [d]efendants shared common ownership, managers

21  and interests."  (ECF 94 at 9:20.)  Plaintiff maintains that these allegations, combined with the

22  allegations that DeCoster Enterprises, Environ and Quality Egg share a business address, "are

23  sufficient, standing alone, to support a *prima facie* case for personal jurisdiction under the alter

24  ego test."  (*Id.* at 9:20-27.)  Plaintiff points to those documents attached to its Request for

25  Judicial Notice, in which DeCoster's attorney represented that DeCoster had sufficient funds to

26  purchase the "Alden facility."  (*See* RJN, Exs. 1-2.)  Plaintiff also relies on the statement of

14

1   DeCoster Enterprises' Chief Financial Officer, Patsy Larson, who represented that she "ha[s]

2   access to the funds on hand and available to the various companies." (*Id.*, Ex. 3.)  Plaintiff

3   argues that these documents raise an inference that DeCoster used the entity defendants' funds

4   for his individual use, and thus, the "corporate distinction between [the entity defendants] was

5   simply a fiction." (*Id.* at 10:20-11:6.)  Finally, plaintiff asserts that "[a]llowing Jack DeCoster

6   and the DeCoster [d]efendants to escape liability based on corporate forms they routinely

7   ignored or disregarded would result in fraud and injustice." (*Id.* at 11:10-11.)

8        "[W]here a corporation is the alter ego of the stockholders so as to justify

9   disregard of the corporate entity[,] jurisdiction over the corporation will support jurisdiction over

10   the stockholders." *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984)

11   (quoting *Sheard v. Superior Court*, 40 Cal.App.3d 207, 210 (1974)); *Colt Studio, Inc. v.*

12   *Badpuppy Enterprise*, 75 F.Supp.2d 1104, 1111 (C.D. Cal. 1999); *see also Wells Fargo & Co. v.*

13   *Wells Fargo Express Co.*, 556 F.2d 406, 425 (9th Cir. 1977).  Thus, when the plaintiff makes a

14   *prima facie* showing of alter ego liability, "the Court may 'pierce the corporate veil'

15   jurisdictionally and attribute 'contacts' accordingly." *ADO Finance, AG v. McDonnell Douglas*

16   *Corp.*, 931 F.Supp. 711, 715 (C.D. Cal. 1996).

17        To make a prima facie showing of alter ego liability, plaintiff must offer evidence

18   sufficient to satisfy the following two-part test:

19        First, the parent must control "the subsidiary to such a degree as to
         render the latter the mere instrumentality of the former." (Citation

20        omitted).  Second, because piercing the corporate veil is a remedy
         founded on principles of equity, there must be enough evidence to

21        support a finding that failure to look past the corporate entity
         would "sanction a fraud or promote injustice." (Citation omitted).

22

23   *Calvert v. Huckins*, 875 F.Supp. 674, 678 (E.D. Cal. 1995).  In other words, "to avail [itself] of

24   the doctrine, plaintiff must allege two elements: First, there must be such a unity of interest and

25   ownership between the corporation and its equitable owner that the separate personalities of the

26   corporation and the shareholder do not in reality exist. Second, there must be an inequitable

15

1  result if the acts in question are treated as those of the corporation alone."  *Wehlage v. EmpRes*

2  *Healthcare,* Inc., 791 F.Supp.2d 774, 782 (N.D. Cal. 2011) (citing *Sonora Diamond Corp. v.*

3  *Superior Court*, 83 Cal. App. 4th 523, 526 (2000)).

4         In evaluating the degree of control wielded by the dominant corporation, courts

5  consider the following factors: (1) substantial ownership of a corporation and dominance over its

6  management; (2) inadequacy of the corporation's capitalization or its insolvency; (3) failure to

7  observe corporate formalities; (4) absence of regular board meetings; (5) nonfunctioning of

8  corporate directors; (6) commingling of corporate and noncorporate assets; (7) the diversion of

9  assets from the corporation to the detriment of creditors; and (8) failure of an individual to

10  maintain an arm's length relationship with the corporation.  *See United States v.*

11  *Healthwin-Midtown Convalescent Hospital and Rehabilitation Center, Inc.*, 511 F.Supp. 416,

12  418-19 (C.D. Cal. 1981), *aff'd,* 685 F.2d 448 (9th Cir. 1982); *see also Wells Fargo & Co.*, 556

13  F.2d at 425.

14         "The essence of the alter ego doctrine is that justice be done."  *Mesler v. Bragg*

15  *Mgmt. Co.*, 39 Cal.3d 290, 301 (1985).  The corporate form is disregarded only in narrowly

16  defined situations when the ends of justice so require.  *Id.*  To prove injustice, the plaintiff must

17  be more than just a creditor attempting to recover on unsatisfied debts; it must show that a

18  defendant's conduct amounted to bad faith.  *See, e.g.*, *United States v. Standard Beauty Supply*

19  *Stores, Inc.*, 561 F.2d 774, 777-78 (9th Cir. 1977).  "[T]he plaintiff must make allegations of fact

20  from which it appears that recognition of the corporate entity would sanction a fraud or promote

21  injustice."  *Monaco v. Liberty Life Assur. Co.*, 2007 WL 1140460, at *4 (C.D. Cal. April 17,

22  2007) (citing *Meadows v. Emett & Chandler*, 99 Cal.App.2d 496, 499 (1950); *see also Wehlage*,

23  791 F.Supp.2d at 782 (holding that, even where plaintiff alleges sufficient facts to demonstrate a

24  unity of interest, defendants cannot be held liable under an alter ego theory unless plaintiff

25  "alleges facts to suggest that an inequitable result will occur if [moving defendants] are not held

26  liable.").  Mere "[c]onclusory allegations of alter-ego status are not sufficient."  *Id.* (citing

1   *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 647 (C.D.Cal. 1983)).  This stringent

2   pleading requirement reflects the principle that "[d]isregarding the corporate entity is recognized

3   as an extreme remedy, and '[c]ourts will pierce the corporate veil only in exceptional

4   circumstances.'"  *Calvert*, 875 F.Supp. at 678 (citation omitted).  Indeed, it is axiomatic that

5   "[t]here is a general presumption in favor of respecting the corporate entity."  *Monaco*, 2007 WL

6   1140460, at *4 (citing *Calvert*, 875 F.Supp. at 678).

7          The pertinent question here is whether the court can attribute Quality Eggs'

8   contacts with the forum to the other entity defendants because each is the "alter ego" of another.

9   This inquiry turns on whether plaintiff has provided sufficient factual allegations to establish

10  both elements of the *prima facie* case for alter-ego liability.  On the record before it, the court

11  finds plaintiff has not adequately alleged or proffered evidence that failure to exercise personal

12  jurisdiction over the entity defendants would result in a fraud or injustice.

13          Plaintiff, in its opposition, makes the allegation that failure to exercise personal

14  jurisdiction over the entity defendants would "confine NuCal's eventual recovery to a sham

15  corporation (Quality Egg) whose assets either have been or later can be moved to other entities

16  or individuals within the consolidated DeCoster enterprises."  (ECF 94 at 11:12-14.)  This

17  conclusory allegation, however, is insufficient to demonstrate the kind of fraud or injustice

18  necessary to invoke the extraordinary remedy of asserting personal jurisdiction via the alter ego

19  theory and ignoring the "general presumption in favor of respecting the corporate form."

20  *Monaco*, 2007 WL 1140460, at *4.

21          Plaintiff neither alleges in its complaint, nor proffers any evidence, that either

22  defendant Quality Egg or Hillandale Farms - the two entities that concede jurisdiction - are

23  currently underfunded or non-operational.  Plaintiff does not allege that defendants have

24  attempted to strip Quality Egg of its assets since the recall, such that plaintiff would potentially

25  receive an unenforceable judgment.  *Cf. Firstmark Capital Corp. v. Hempel Financial Corp.*,

26  859 F.2d 92, 94 (9th Cir. 1988) ("[U]nder California law the kind of inequitable result that

17

1   makes alter ego liability appropriate is an abuse of the corporate form, such as under-

2   capitalization or misrepresentation of the corporate form to creditors.") (internal quotations

3   omitted)); see also Calvert, 875 F.Supp. at 679-80 (finding no evidence of resulting injustice

4   where plaintiff made "no allegations of fraud or similar misdeeds," or of attempts to strip

5   dominated company of assets to avoid liability).  To the contrary, the representative designated

6   for deposition by DeCoster Enterprises, the Trust and Quality Egg[8] - their attorney, William

7   Smith - testified that Quality Egg is currently a company actively conducting business, selling

8   young chickens and supervising construction on facilities.  (Smith Depo. at 36:24-37:8.)

9   Moreover, Quality Egg's CEO stated in his declaration that "Quality Egg maintains, and always

10  has maintained, its own bank accounts."  (DeCoster Decl. ¶ 4.)  Plaintiff has proffered no

11  evidence to contradict this testimony, besides conclusory allegations that defendants committed

12  fraud "to escape liability" and "confine NuCal's recovery to a sham corporation . . . whose assets

13  . . . can be moved to other entities."  (ECF 94 at 11:12-14.)

14          Moreover, plaintiff's contention that the "corporate distinctions between Jack

15  DeCoster, Quality Egg, the DeCoster [d]efendants and the other DeCoster entities were simply a

16  fiction" is belied by the testimony plaintiff relies on in support of personal jurisdiction.

17  Specifically, Smith testified at deposition that DeCoster Enterprises "acts more or less like a

18  central bank for a number of the DeCoster entities"  (Smith Depo. at 22:16-18) in that "it is the

19  lead on borrowing from banks, which makes it easier to handle the money."  (Id. at 23:5-7.)  If

20  "one of the companies needs money, they borrow it from Enterprises" (id. at 23:8) with an

21  interest rate "based off the Wall Street Journal number."  (Id. at 23:13-15.)  Essentially, if one of

22  the affiliated entities, with operations in a number of states, needed capital for a project, it would

23

24          [8] Plaintiff argues the court should infer that the entity defendants are alter egos of one-
     another because they designated a single person for deposition.  The mere fact that the same
25   attorney represents each of these defendants is insufficient for the court to infer that failure to
     attribute Quality Egg's forum contacts to either DeCoster or the Trust would result in some sort
26   of fraud or injustice.

18

1  borrow the money from DeCoster Enterprises and then make standard payments with interest.

2  This system was set up to provide "a better accounting method at the same time they amortize

3  the loan." (*Id.* at 61:6-7.)

4          The Trust passively owns the stock in Quality Egg and DeCoster Enterprises.

5  (*Id.* at 30:13-21.) According to Smith, the Trust was formed for efficiency purposes: to ensure

6  that, in the case of DeCoster's death, probate would not occur in "Maine and Ohio and Iowa and

7  Nebraska and other states that DeCoster had a financial interest."[9] (*Id.* at 32:25-33:8.)

8          Environ owned and leased the land where the eggs were produced to Quality Egg.

9  (Smith Depo. at 75:3-5; DeCoster Decl. ¶¶ 5,7.) Indeed, in his declaration, Peter DeCoster stated

10 that "[d]uring the time periods relevant to this lawsuit, Environ/Wright County Inc. was owned

11 by non-party Julie Glessner" and "was not owned or controlled by Quality Egg, DeCoster

12 Revocable Trust or DeCoster Enterprises; nor did Environ/Wright County Inc. own or control

13 any of these entities." (DeCoster Decl. ¶ 6.) Moreover, "Environ never made any payments to

14 DeCoster Enterprises; "Quality Egg would do the payments." (Smith Depo. at 58:15-16.)

15         Quality Egg was formed to be the "operational arm of DeCoster operations in

16 Iowa," meaning it handled the selling of eggs, building maintenance, and raising pullets. (*Id.* at

17 32:11-12.) In other words, Quality Egg took out loans with DeCoster Enterprises for purposes

18 of purchasing, for example, prepaid feed for the chickens. (*Id.* at 60:13-17.) Quality Egg, as the

19 operational arm, without inclusion of the other entities, produced and delivered the eggs that

20 caused the alleged harm.

21 /////

22

23     [9] Plaintiff makes the argument that personal jurisdiction is appropriate because the
24 entities were set up to avoid personal liability. That the entities were set up in order to avoid
   potential liability is irrelevant to the personal jurisdiction analysis here. Indeed, almost every
25 business enterprise in the United States ultimately forms some sort of corporate entity for the
   purpose of avoiding personal liability. It is only when the plaintiff demonstrates that the owner
26 or controller of a corporate entity is using corporate funds for personal use that the court may
   apply the extraordinary remedy of disregarding the corporate form by piercing the corporate veil.

1    This record before the court demonstrates that, contrary to plaintiff's contention,

2    the various entities were not set up for purposes of stripping and transferring funds between

3    entities to avoid liability, but rather were created for purposes of establishing an efficient

4    business model.  Indeed, the evidence underscores the fact that the Trust, DeCoster Enterprises

5    and Environ had no involvement in the production and sale of the tainted eggs to California:

6    DeCoster Enterprises merely provided the capital that permitted Quality Egg to operate; the

7    Trust held the stock of the entity that allegedly caused the harm; and Environ leased the land on

8    which Quality Egg produced the allegedly tainted eggs.  Absent an express showing of fraud,

9    collusion or manifest injustice, this court cannot exercise personal jurisdiction over DeCoster for

10   loaning money to Quality Egg, the Trust for owning Quality Egg, or Environ for leasing land to

11   Quality Egg.

12   Plaintiff has failed to show that "those who control [these] companies treat them

13   as a single or unitary enterprise [in order to] assert their corporate separateness in order to

14   commit frauds and other misdeeds with impunity."  *Las Palmas Assoc. v. Las Palmas Center*

15   *Assoc.*, 235 Cal.App.3d 1220, 1249 (1991).  As such, plaintiff has failed to establish a *prima*

16   *facie* case that DeCoster Enterprises, the Trust or Environ are subject to personal jurisdiction

17   under an alter ego theory.

18   3.    Agency Theory

19   Plaintiff's final theory in support of its contention that the exercise of personal

20   jurisdiction over the entity defendants is proper is that Quality Egg was acting as the agent of the

21   Trust, DeCoster Enterprises and Environ.  Defendants argue that plaintiff's agency theory is

22   untenable because the First Amended Complaint is bereft of any allegation whatsoever that

23   Quality Egg was acting as an agent of the entity defendants when it sold and shipped the

24   allegedly tainted eggs to NuCal in California.[10]  (*See* ECF 71 at 12:25-28.)  Plaintiff in its

25

26   [10]  As set forth above, plaintiff did allege that the DeCoster defendants were agents of one
     another (FAC ¶ 24).  This allegation, however, is a legal conclusion insufficient to meet

20

1   opposition, contends, in conclusory fashion, that "[t]he same allegations and judicially noticeable

2   documents that support alter ego liability also establish a *prima facie* case of agency liability."

3   (ECF 94 at 12:6-7.)

4           To satisfy the agency test for purposes of establishing personal jurisdiction, the

5   plaintiff must show "that the subsidiary functions as the parent corporation's representative in

6   that it performs services that are 'sufficiently important to the foreign corporation that if it did

7   not have a representative to perform them, the corporation's own officials would undertake to

8   perform substantially similar services.'" *Unocal Corp.*, 248 F.3d at 928 (quoting *Chan v. Society*

9   *Expeditions, Inc*., 39 F.3d 1398, 1405 (9th Cir. 1994)).  "Consequently, '[t]he question to ask is

10  . . . whether, in the truest sense, the subsidiar[y's] presence substitutes for the presence of the

11  parent.'" *Id.* at 928-29 (quoting *Gallagher v. Mazda Motor of Am., Inc.*, 781 F.Supp. 1079, 1084

12  (E.D. Pa. 1992)).  "At an irreducible minimum, the general agency test requires that the agent

13  perform some service or engage in some meaningful activity in the forum state on behalf of its

14  principal such that its presence substitutes for presence of the principal." *Id.* at 930 (internal

15  quotation marks omitted).  The agency test is generally satisfied by showing that "the subsidiary

16  functions as the parent corporation's representative in that if it did not have a representative to

17  perform them, the corporation's own officials would undertake to perform substantially the same

18  services." *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011) (quoting

19  *Uncocal*, 248 F.3d at 926).

20          Plaintiff's broad and conclusory allegation that Quality Egg was the entity

21  defendants' agent for purposes of personal jurisdiction is insufficient to satisfy its burden.

22  Plaintiff does not demonstrate that Quality Egg was selling and delivering the eggs to California

23  for the benefit of the defendants.  More importantly, plaintiff has neither alleged nor adduced

24  evidence that Quality Eggs' sale and delivery of the eggs to NuCal was of such fundamental

25  _____

26  plaintiff's burden of establishing that Quality Egg was acting as DeCoster's agent.

1    importance that had Quality Egg not performed this function, the entity defendants would have.

2    *Id.* ("The [agency] test is predicated upon a showing of the *special importance* of the services

3    performed by the subsidiary." (emphasis in original).).  Indeed, the evidence supports the inverse

4    conclusion: the Trust was merely a passive owner of Quality Egg, which did not even have a

5    bank account; DeCoster Enterprises' sole business was loaning money; and Environ merely

6    leased the land on which the eggs were produced.  To accept plaintiff's conclusory argument that

7    the entity defendants are subject to personal jurisdiction under the agency theory for the same

8    reasons they are subject to personal jurisdiction under the alter ego theory would nullify the clear

9    distinctions between the two theories.

10                   Plaintiff has failed to show that either DeCoster Enterprises, the Trust or Environ

11   purposefully availed itself of the benefits of conducting business in the forum, or that the forum-

12   related activities of Quality Egg should be attributed to it.  As such, this court cannot, in

13   accordance with due process, exercise personal jurisdiction over any one of these entities.  The

14   entity defendants' motion is therefore granted.

15           B.      DeCoster's Motion

16                   1.      Purposeful Availment

17                   Defendant DeCoster contends that "[t]here are simply no allegations in the FAC

18   that DeCoster, as an individual, had any contacts with California."  (Austin Jack DeCoster's

19   Mot. to Dismiss ("ECF 73") at 3:21:22.)  DeCoster further maintains that, even if, as plaintiff

20   alleges, he had "ultimate authority" over the entities with sufficient forum contacts, that is

21   "insufficient to establish personal jurisdiction" over him.  (*Id.* at 3:22-23.)

22                   Plaintiff maintains the following allegations "are more than sufficient to show that

23   Jack DeCoster was personally involved with the production and sale of [Salmonella]-tainted

24   eggs to NuCal": DeCoster owned the Trust, which owned Quality Egg; DeCoster had ultimate

25   authority over Quality Egg's operations; DeCoster was part of the consolidated farming

26   enterprise named "Wright County Egg"; DeCoster used the name "DeCoster Farms," which is

                                                22

the entity that submitted samples to Iowa State University for testing; DeCoster knew about the

Salmonella contamination three months before the first recall.  (Pl.'s Opp'n to Austin Jack

DeCoster's Mot. to Dismiss ("ECF 95") at 6:18-7:16.)  Plaintiff also points to the documents

attached to its Request for Judicial Notice, which plaintiff argues "show, on their face, that Jack

DeCoster used "Wright County Egg" and "Wright County Egg Production" as his *personal* trade

name."  (*Id.* at 7:17-8:5 (emphasis in original).)

> The mere fact that a corporation is subject to local jurisdiction does not necessarily mean its nonresident officers, directors, agents, and employees are subject to jurisdiction as well. *See Calder v. Jones*, 465 U.S. 783, 790 (1984); *Davis v. Metro Productions*, Inc., 885 F.2d 515, 521 (9th Cir.1989). "For jurisdictional purposes, the acts of corporate officers and directors in their official capacities are the acts of the corporation exclusively and are thus not material for purposes of establishing minimum contacts as to the individuals." *See Shearer v. Superior Court*, 70 Cal. App. 3d 424, 430, 138 Cal.Rptr. 824 (1977). Implicit in this principle is the consideration that corporations are separate legal entities that cannot act on their own but must do so through their appointed representatives. *See Mihlon v. Superior Court*, 169 Cal.App. 3d 703, 713, 215 Cal.Rptr. 442 (1985). Accordingly, acts performed by these individuals, in their official capacities, cannot reasonably be attributed to them as individual acts creating personal jurisdiction. *See id.*

*Colt Studio,* 75 F.Supp.2d at 1111.

However, "[a] corporate officer's contacts on behalf of a corporation [can be]

sufficient to subject the officer to personal jurisdiction where the officer is a primary participant

in the alleged wrongdoing or had control of, and direct participation in the alleged activities."

*Allstar Marketing Group, LLC v. Your Store Online, LLC*, 666 F.Supp.2d 1109, 1120 (C.D. Cal.

2009) (quoting *Matsunoki Group, Inc. v. Timberwork Oregon, Inc.*,  2009 WL 1033818, at *3-4

(N.D. Cal. Apr. 16, 2008)).   "[C]ases which have found personal liability on the part of

corporate officers have typically involved instances where the defendant was the 'guiding spirit'

behind the wrongful conduct . . . or the 'central figure' in the challenged corporate activity."

*Davis v. Metro Productions*, 885 F.2d 515, 524 (9th Cir. 1989) (quoting *Escude Cruz v. Ortho

Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)).

23

Plaintiff's contention as to DeCoster that it has satisfied the purposeful availment prong of the specific jurisdiction test falls short for one essential reason: Plaintiff has neither alleged, nor demonstrated, that DeCoster was personally involved in either the sale or delivery of the allegedly tainted eggs to California.  Plaintiff only alleges that DeCoster used various trade names and was the trustee of the Trust that owned the corporation that allegedly caused the harm, at least two steps removed from the forum contacts at issue.  Neither of these allegations demonstrates that DeCoster himself was the "central figure" in selling the tainted eggs to NuCal in California.  *Davis*, 885 F.2d at 524.  Mere ownership or control of an entity, even if that entity was responsible for shipping the allegedly tainted eggs to California, is insufficient to demonstrate that DeCoster himself  had such "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 315.  Plaintiff has not met its burden of demonstrating that DeCoster has purposefully availed himself of the benefit of doing business in California, and therefore also has not carried its burden of establishing a *prima facie* case of specific jurisdiction over DeCoster individually.

2.      Alter Ego Theory

Plaintiff alleges that the court should disregard the corporate form, and attribute Quality Egg's contacts with the forum to DeCoster individually, because "Jack DeCoster was part of a consolidated enterprise that operated the Iowa farms, that the enterprise was conducted using entities that DeCoster directly or indirectly owned and controlled, and that the enterprise used a variety of trade names, including 'Wright County Egg,' to refer to its operation."  (ECF 95 at 918-923.)  Plaintiff argues that its "alter ego" theory is supported by the fact that "DeCoster Enterprises, Environ/Wright and Quality Egg operated out of the same business address."  (*Id.* at 9:23-24.)

Plaintiff also points to the documents attached to plaintiff's Request for Judicial Notice.  Plaintiff argues that these documents - filings from a state-court action in which

24

1   DeCoster was the plaintiff - demonstrate that DeCoster believed he "could buy and run the

2   Alden Farms" and that "DeCoster has available funds 'for all purposes' in more than $15

3   million." (*Id.* at 10:4-8.)  Plaintiff also points to a declaration, signed by DeCoster Enterprise's

4   CFO Patty Larson,  "which states that she has access to the funds on hand and available to the

5   various companies in the DeCoster group of companies." (*Id.* at 10:9-14 (internal quotations

6   omitted).)  According to plaintiff, "[t]hese documents raise at least a reasonable inference that

7   Jack DeCoster considered the assets of his 'group of companies' to be his assets, and that he

8   could access these assets for his personal purchase of the Alden Farm." (*Id.* at 10:15-17.)

9           As set forth above, in order to assert jurisdiction over DeCoster under an alter ego

10  theory, plaintiff must establish "that there is such a unity of interest and ownership between the

11  corporation and the shareholder that the two no longer exist as separate entities" and "that failure

12  to disregard the corporation would result in fraud or injustice."  *Seymour v. Hull Moreland*

13  *Engineering*, 605 F.2d 1105, 1111 (9th Cir. 1979).

14          Plaintiff's contention that the court should ignore the corporate form and assert

15  jurisdiction over DeCoster because he is part of the consolidated enterprise through which he

16  filters funds for the sole purpose of avoiding liability is unfounded.  Even if, as plaintiff alleges,

17  DeCoster is the common owner of a "consolidated enterprise" operating farms under various

18  trade names, "common ownership alone is insufficient to support disregard of the corporate

19  form."  *Chan*, 123 F.3d at 1294; *see also Hollywood Cleaning & Pressing Co. v. Hollywood*

20  *Laundry Service*, 217 Cal. 124, 130 (1932) ("[T]he mere circumstance that all of the capital

21  stock of a corporation is owned or controlled by one or more persons, does not, and should not,

22  destroy its separate existence; were it otherwise, few private corporations could preserve their

23  distinct identity*, . . .*").

24          The evidence submitted in support of plaintiff's alter ego theory is similarly

25  unavailing.  Those declarations were filed in a separate action in which  DeCoster was a plaintiff,

26  stating the "DeCoster group of companies" had sufficient funds to purchase the Alden facility.

(RJN ¶¶ 1, 3; ECF 95 at 101-113.)  That DeCoster believed he had sufficient funds to purchase the Alden facility does not establish that of the legal separateness of Quality Egg and DeCoster was a sham, thus warranting the extraordinary remedy of piercing the corporate veil to attribute Quality Egg's forum contacts to DeCoster.  There is simply no evidence in the record that DeCoster abused his position by using Quality Egg's corporate assets for personal, non-business purposes.  DeCoster did not even have check writing power for Quality Egg.  (Smith Depo. at 40:12-13.)

Even if plaintiff's allegations and evidence established that the "separate personalities of the corporation and [DeCoster] do not in reality exist," *Wehlage*, 791 F.Supp.2d at 782, plaintiff has not alleged or provided evidence that disregarding the corporate form would result in a fraud or injustice, as required by the test for alter ego liability.  Plaintiff, in its opposition, offers no argument supporting the second element of the *prima facie* case for establishing alter ego liability.  (*See generally* ECF 95 at 8:20-11:22.)  As set forth above, Quality Egg is still a fully operational business entity.  Plaintiff has failed to meet its burden of establishing the existence of personal jurisdiction over DeCoster under an alter ego theory.[11]

IV.   CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

1.    The motion to dismiss for lack of personal jurisdiction by defendants Environ/Wright County Inc., Decoster Enterprises LLC and DeCoster Revocable Trust is GRANTED.

/////

---

[11]  Plaintiff also argues that  DeCoster is subject to personal jurisdiction under an Agency theory.  In support of its contention, plaintiff makes the same conclusory argument it made in support of its contention that the entity defendants were subject to personal jurisdiction via agency: that "[t]he same allegations and judicially noticeable documetns that support alter ego liability also establish a *prima facie* case of agency liability."  (ECF 95 at 12:5-6.)  Plaintiff's argument is unavailing for the same reasons set forth above in the court's analysis of the entity defendants' motion to dismiss in section III(A)(3).

    2.  The motion to dismiss for lack of personal jurisdiction by defendant

Austin Jack DeCoster is GRANTED.

  IT IS SO ORDERED.

DATED:  August 14, 2012.

_____
UNITED STATES DISTRICT JUDGE