IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NUCAL FOODS, INC.,

      Plaintiff,                                   No. CIV S-10-3105 KJM-CKD

      vs.

QUALITY EGG LLC; et al.,

      Defendants.                       <u>ORDER</u>

/

        This matter comes before the court upon defendant Quality Egg's motion to dismiss seven of plaintiff NuCal's eight claims.  (ECF 70.)  This motion was decided without a hearing.  For the following reasons, defendant's motion to dismiss is DENIED in part and GRANTED in part.

I.      <u>ALLEGED FACTS AND PROCEDURAL HISTORY</u>

        This case arises out of a massive recall in August 2010 of shell eggs precipitated by an outbreak of salmonella enteritidis ("SE") that sickened as many as 62,000 people.  (First Am. Compl. ¶ 1) ("FAC").  At all times relevant to this action, plaintiff purchased eggs from defendant through a commercial exchange called the "Egg Clearinghouse, Inc." ("ECI").  (*Id.* ¶ 79.)  Plaintiff alleges that defendant became aware of a heightened risk of SE contamination at defendant's farms in early 2010.  (*Id.* ¶ 6.)  Plaintiff further alleges that defendant had actual

1

knowledge, no later than March 2010, that many of its chicken houses were contaminated with SE, and that by June 2010, its hens also had tested positive for SE. (*Id.* ¶¶ 5, 7.) Plaintiff avers that despite this knowledge, defendant continued to sell plaintiff eggs from contaminated farms without warning plaintiff or regulators and without conducting tests on eggs from contaminated farms. (*Id.* ¶ 9.)

On July 9, 2010, new federal egg safety rules took effect. (*Id.* ¶ 13.) These rules require SE positive farms to divert eggs to other facilities or to keep them out of the market until tests confirm they are contamination free. (*Id.*) Plaintiff alleges defendant, through omissions and misrepresentations, failed to comply with these new rules; for example, defendant represented it would notify plaintiff of any SE positive environmental tests involving farms that produced eggs plaintiff purchased. (*Id.* ¶¶ 156-157.) Plaintiff alleges defendant acted upon defendant's knowledge of the SE positive tests only when the FDA stepped in. (*Id.* ¶ 15.) Defendant then tested eggs produced at its farms and discovered about 170 SE-infected eggs. (*Id.* ¶ 16.) Defendant finally instituted a recall in August 2010. (*Id.* ¶ 1.) Before, during and after the recall, defendant allegedly obfuscated and failed to cooperate fully with the FDA and with the U.S. House of Representatives' inquiry into the SE outbreak. (*Id.* ¶¶ 15, 17.)

Plaintiff filed its initial complaint on November 18, 2010 against three defendants, Quality Egg LLC ("Quality Egg"), Wright County Egg, and Hillandale Farms, alleging seven causes of action. (ECF 1.) The court granted plaintiff's motion to amend on January 27, 2012 (ECF 60) and plaintiff filed its amended complaint on January 30, 2012 (ECF 61). The amended complaint names eight defendants — Quality Egg, DeCoster Revocable Trust ("DeCoster Trust"), Austin "Jack" DeCoster, DeCoster Enterprises LLC ("DeCoster Enterprises"), Environ/Wright County Inc. ("Environ"), Hillandale Farms, Hillandale LLC, and Hillandale PA — and alleges eight causes of action: 1) breach of implied warranty of merchantability against Quality Egg, DeCoster Trust, Jack DeCoster, DeCoster Enterprises, Environ, and Hillandale PA; 2) breach of implied warranty of fitness for particular purpose

2

against Quality Egg, DeCoster Trust, Jack DeCoster, DeCoster Enterprises, Environ, and Hillandale PA; 3) breach of express warranty against Quality Egg, DeCoster Trust, Jack DeCoster, DeCoster Enterprises, Environ, and Hillandale PA; 4) fraud against all defendants; 5) negligence against all defendants; 6) equitable indemnification against all defendants; 7) negligent interference with prospective economic advantage against all defendants; and 8) unfair competition.[1]

On August 15, 2012, defendants Jack DeCoster, DeCoster Trust, DeCoster Enterprises, and Environ/Wright County were dismissed from this action for lack of personal jurisdiction. (ECF 156.) The remaining defendants are the three Hillandale entities and Quality Egg.

Defendant Quality Egg moves to dismiss all but claim VI. Defendant argues plaintiff's fraud and negligence claims, claims IV, V and VII, are barred by the economic loss rule. Defendant asserts claims I, II and III lack essential elements. Finally, defendant avers that counts IV and VIII fail because they do not state fraud causes of action with particularity. The court will address each argument in that order.

II.   STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." A court may dismiss "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

Although a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to survive a motion to dismiss this short and plain statement "must contain sufficient factual matter . . . to 'state a

---

[1] The complaint labels two claims as "seven." This court identifies the second "seven" as the eighth claim.

3

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Ultimately, the inquiry focuses on the interplay between the factual allegations of the complaint and the dispositive issues of law in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In making this context-specific evaluation, this court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987).  This rule does not apply to "'a legal conclusion couched as a factual allegation,'" *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (quoted in *Twombly*, 550 U.S. at 555), nor to "allegations that contradict matters properly subject to judicial notice" or to material attached to or incorporated by reference into the complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A court's consideration of documents attached to a complaint or incorporated by reference or matter of judicial notice will not convert a motion to dismiss into a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

III.   APPLICATION

    A.   The Economic Loss Rule

Plaintiff alleges wide-ranging damages, including lost sales, lost profits, recall-related administrative costs, and the loss of goodwill and reputation for the recalled brands. (FAC ¶¶ 158, 163.)  Plaintiff also alleges its buyers have demanded credit for the recalled eggs and for their incidental and consequential costs related to the recall, and demanded that certain brand names be retired due to the recall.  (*Id.* ¶¶ 158, 163.)  Plaintiff further seeks compensatory

4

damages because it "has suffered lost future business and sales from customers who have blamed NuCal for the disruption, loss of goodwill and food safety panic that resulted from the defendant's negligence and misconduct, or who have associated NuCal and NuCal's brands with the defendant's negligence and misconduct." (*Id.* ¶ 174.)

Defendant contends plaintiff does not allege the recalled eggs caused any physical harm to individuals or property and is therefore barred by the economic loss rule. (Mot. at 6-8, ECF 70.) Plaintiff concedes its economic losses "include the reduced value of the eggs recalled by Quality Egg"; "the costs of shipping and disposing of the Quality Egg recalled eggs"; and "the profits that were lost when the Quality Egg eggs were recalled." (Opp'n at 10, ECF 97.)

However, plaintiff contends its losses were not limited to those arising from the defective eggs; rather, its recall "necessarily included all eggs that NuCal processed on the dates when the defendants' SE-tainted eggs were in NuCal's processing plants," and many of these eggs had nothing to do with plaintiff's contractual relationship with defendants. (*Id.*) Specifically, plaintiff alleges that its losses also included "the product cartons and other materials that NuCal used to package the defendant's SE-tainted eggs" and "[t]he destruction of eggs from other sources, as well as the destruction of packaging materials." (*Id.*) These losses, plaintiff contends, constitute damages to other property that takes plaintiff's negligence claims outside the scope of the economic loss rule (*Id.*)

Defendant replies that most of this damage to other property is not pled in the first amended complaint. (Reply at 5-6, ECF 114.) Plaintiff did not allege which eggs were recalled, defendant contends, and did not specifically allege that any eggs were physically damaged (*Id.*) Defendants also argue they owed plaintiff no legal duty independent of the contract and that the parties did not have a "special relationship" such that the economic loss rule's other exceptions would apply. (*Id.* at 6-8.)

Generally, purely economic losses are not recoverable in tort. *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1376 (9th Cir. 1978); *Seely v. White Motor Co.*, 63 Cal. 2d 9,

5

16-17 (Cal. 1965). Put simply, "the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.'" *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (Cal. 2004) (quoting *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999)). However, a plaintiff can recover in tort after a contract breach in three situations. First, when a "product defect causes damage to 'other property,' that is, property other than the product itself." *Jimenez v. Superior Court*, 29 Cal. 4th 473, 483 (Cal. 2002) (emphasis omitted). Second, when a defendant breaches a legal duty independent of the contract, irrespective of whether damages are economic. *Robinson*, 34 Cal. 4th at 989. Third, if a "special relationship" existed between the parties, a party can still recover when the economic loss rule would otherwise apply. *J'aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (Cal. 1979).

"Economic loss . . . has been defined as the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold. 'Economic loss generally means pecuniary damage that occurs through loss of value or use of the goods sold or the cost of repair together with consequential lost profits *when there has been no claim of personal injury or damage to other property*.'" *San Francisco Unified Sch. Dist. v. W.R. Grace & Co.*, 44 Cal. Rptr. 2d 305, 310 n.5 (Cal. Ct. App. 1995) (quoting *MDU Res. Group v. W.R. Grace and Co.*, 14 F.3d 1274, 1279 (8th Cir. 1994) (original emphasis)).

### 1. Plaintiff's Negligence Claims (Claims V and VII)

The court finds the economic loss rule does not entirely bar plaintiff's negligence claims because plaintiff has sufficiently pled damage to "other property." In support of its contention that it suffered damage to other property, namely other eggs and materials unrelated

/////

/////

/////

/////

6

to the Quality Egg contract, plaintiff cites to two paragraphs in the First Amended Complaint:

> In accordance with usual practice in the industry, NuCal sold the eggs it purchased from "Wright County Egg" and Hillandale together with eggs from other sources. NuCal sold and distributed these eggs to several retail customers.
>
> As a result of defendants' conduct, NuCal also faces a loss of business for egg brands that it sold and that have now become associated with the defendants' practices. At least one NuCal customer refused to accept further shipments of cartons bearing a brand name that was included in the recall. The defendants' conduct also resulted in a decline in egg sales by NuCal and others.

(FAC ¶¶ 92, 104.) The product at issue here, for the purposes of economic loss analysis, is defendant Quality Egg's eggs. If plaintiff has sufficiently alleged damage to property other than Quality Egg's eggs, then the economic loss rule does not apply.

      The court can reasonably infer from the two paragraphs in the complaint and other alleged facts that plaintiff plausibly suffered damages to other property, such as "[t]he destruction of eggs from other sources, as well as the destruction of packaging materials . . . ." (ECF 96 at 9.); *see Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987) (in evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party")). Plaintiff pleads that defendants' eggs were packaged with eggs from other suppliers; therefore, it is plausible that eggs with different origins were recalled together. (FAC ¶¶ 92, 104.) The court infers that some quotient of eggs and packing materials affected by the recall are not related to the "product itself," that is, Hillandale eggs. (FAC ¶ 163.) Further, it is plausible that eggs (and associated packing materials) recalled for SE contamination are physically destroyed. Therefore, it is plausible from the allegations in the FAC that "other property" was physically damaged as a result of defendant's alleged negligence. (*See* ECF 97 at 10 (stating that recalled eggs, cartons, and packaging were "necessarily destroyed").) Such damages beyond the contemplation of the parties in their contractual bargain fall outside the scope of the economic loss rule. *Robinson*, 34

7

Cal. 4th at 988-89 ("[W]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone . . . unless he can demonstrate harm above and beyond a broken contractual promise . . . regardless of the terms of any warranty.") (citing *Jimenez*, 29 Cal. 4th at 482); *see also Erlich v. Menezes*, 21 Cal. 4th543, 550-51 (Cal. 1999) (discussing the different roles contract and tort law damages fulfill).

        Public policy rationales utilized by the California Supreme Court in economic loss cases also weigh in favor of allowing plaintiff's negligence claims to proceed. In *Robinson*, the court held that tort damages are particularly appropriate in instances where a defendant's conduct violates social policy. *Id.* at 4th at 993 (stating "parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction"; quotation marks and citations omitted). Even if plaintiff accounted for the wide-ranging consequences of possible SE contamination when it contracted with defendants, plaintiff could not be expected to consider defendants' deliberate misrepresentations or material omissions regarding SE contamination. Some amount of plaintiff's non-economic damages may be attributable to defendants' alleged misconduct, which misconduct is the province of torts, as opposed to contract law, to deter. *Id.* at 992-93. In so concluding, the court is "careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce." *Id.* at 992 (quoting *Erlich*, 21 Cal. 4th at 554).

        The remainder of plaintiff's alleged damages, including loss of reputation and lost profits and sales, is covered by the economic loss rule and cannot sound in tort. This kind of damage is "pecuniary damage that occurs through loss of value or use of the goods sold or the cost of repair together with consequential lost profits . . . ." *San Francisco Unified Sch. Dist.*, 44 Cal. Rptr. 2d at 310 n.5; *see also Barrier Specialty Roofing & Coatings, Inc. v. ICI Paints N. Am., Inc.*, No. CV F 07-1614 LJO TAG, 2008 WL 1994947, at *6 (E.D. Cal. May 6, 2008) (holding reputational and other damages not associated with property damage or personal injury

are not recoverable in tort); *Carrau v. Marvin Lumber and Cedar Co.*, 112 Cal. Rptr. 2d 869 (Cal. Ct. App. 2001) (holding recovery for the diminished value of a house in which defective windows were installed is barred by the economic loss rule).

Plaintiff's contention that it can still recover for these economic damages because exceptions to the economic loss rule apply fails. Plaintiff avers defendant breached a duty independent of the contract; in the alternative, plaintiff asserts a "special relationship" existed between the parties. (ECF 97 at 11-12.) The court finds that defendant did breach a duty independent of the contract, but this fact cannot sustain plaintiff's negligence claims. As described below in the discussion of plaintiff's fraud claim, *Robinson* holds that the independent duty exception to the economic loss rule can apply to claims of intentionally tortious conduct, but the court can find no case law to suggest this exception can apply to negligent conduct. *Robinson*, 34 Cal. 4th at 991. Plaintiff argues that defendant violated an independent duty by violating the California Health and Safety Code; therefore, it need not show intentional tortious conduct. (ECF 97 at 11-12.) Plaintiff did not, however, allege defendant breached this code in the first amended complaint.

The court also finds that no special relationship existed between the parties to this motion. To determine whether a special relationship exists, courts must examine six factors: 1) the extent to which the transaction was intended to affect the plaintiff; 2) the foreseeability of harm to the plaintiff; 3) the degree of certainty that the plaintiff suffered injury; 4) the closeness of the connection between the defendant's conduct and the injury suffered; 5) the moral blameworthiness of defendant's conduct; and 6) policy considerations to prevent future harm. *J'aire Corp.*, 24 Cal. 3d at 804. The first factor alone may be dispositive: to satisfy it, a party must demonstrate the relevant transaction "affect[ed] the plaintiff in particular as opposed to similarly situated purchasers." *Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc.*, No. C 96-2494 CW, 2009 WL 1636036, at *5 (N.D. Cal. June 8, 2009); *Ott v. Alfa-Laval Agri, Inc.*, 37 Cal. Rptr. 2d 790, 802 (Cal. Ct. App. 1995) ("[T]o the extent the milking system was intended to

affect the plaintiffs in the same way as all retail buyers, this becomes a traditional products liability or negligence case in which economic damages are not available." (citing *Seely*, 63 Cal. 2d at 16-17)).

Plaintiff cites paragraphs in the first amended complaint to support its contention that the egg sales at issue here were intended to affect it. (FAC ¶¶ 162, 172; ECF 97 at 13.) Those paragraphs do not demonstrate that defendant's sale of eggs were intended peculiarly to affect plaintiff as opposed to all other purchasers similarly situated. They state instead that defendant knowingly sold eggs to plaintiff knowing plaintiff would repackage them with other brands of eggs. The court declines to find a special relationship here and convert a negligent breach of contract into a tort action. *See Erlich*, 21 Cal. 4th at 550-51 (describing the different goals of tort and contract law and lamenting the rise of "con*torts*") (emphasis in original). Therefore, the economic loss rule bars plaintiff, on its negligence theories, from recovering damages other than the alleged physical damage to other property.

          2.       Plaintiff's Fraud Claim (Claim IV)

Plaintiff's fraud claim is not barred by the economic loss rule in any respect. *See Robinson*, 34 Cal. 4th at 999 ("[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law."). Plaintiff alleges that defendant intentionally concealed, omitted, and/or failed to disclose that its farms and hens were contaminated with SE. (FAC ¶¶ 151-155.) Moreover, plaintiff alleges that as of July 9, 2010, defendant falsely represented it would comply with the new FDA egg rule, which required defendant to disclose positive SE tests. (*Id.* ¶ 156.) Plaintiff relied on defendant's intentional omissions and misrepresentations by continuing to purchase and resell eggs that were potentially contaminated. (*Id.* ¶ 157.) As a result, plaintiff suffered damages. (*Id.* ¶ 158.)

Defendant argues the economic loss rule, as interpreted in *Robinson*, forecloses recovery for failure to disclose or intentional concealment. (ECF 70 at 8.) It also asserts

plaintiff's intentional misrepresentation theory is barred by the economic loss rule. (*Id.* (citing *Robinson* and *Multifamily Captive Group, LLC v. Assurance Risk Managers, Inc.*, 629 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009).)

*Robinson* explicitly did not address the question whether a case involving material omissions, rather than affirmative misrepresentation, would similarly be exempt from the economic loss rule. *Robinson*, 34 Cal. 4th at 991. The opinion strongly suggests no meaningful distinction exists between intentional concealment and intentional misrepresentation; rather, the material distinction is whether the tortious conduct was intentional or negligent. *Id.* at 990 (noting that California courts have found exceptions to the economic loss rule in this non-contractual duty category where a defendant's conduct was committed "intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages"). Moreover, it is plausible some amount of plaintiff's damages, whether economic or not, would not have been incurred had defendant informed plaintiff about the positive SE tests rather than intentionally concealing them. Additionally, *Multifamily Captive Group* does not contradict *Robinson* in any way and is inapplicable to the instant case; there, the alleged misrepresentation was the contract itself. 629 F. Supp. 2d at 1146. Here, as in *Robinson*, plaintiff alleges intentional misconduct beyond the contract between the parties.

Ultimately, the court finds *Robinson* controls the question whether an independent duty exists in this case such that plaintiff's fraud claim can go forward on any theory of intentionally tortious conduct. In *Robinson*, the defendant made affirmative misrepresentations and/or concealed material facts regarding the specifications of sprag clutches[2]

---

[2] "The sprag clutch on a helicopter functions like the 'free wheeling' clutch mechanism on a bicycle where the rider transmits power to the rear wheel by operating the pedals, but when the rider stops pedaling, the wheel continues to rotate. A sprag clutch is primarily a safety mechanism. If a helicopter loses power during flight, the sprag clutch allows the rotor blades to continue turning and permits the pilot to maintain control and land safely by the 'autorotating' of the rotor blades." *Robinson*, 34 Cal. 4th at 985.

11

the plaintiff used in manufacturing helicopters. *Robinson*, 34 Cal. 4th at 985. Based on this misrepresentation, the plaintiff accepted and installed the clutches, ultimately causing plaintiff's damages, which were quintessentially economic. *Id.* at 992-93. No injuries or damage to other property, including helicopters, was alleged; rather, the Federal Aviation Administration (FAA) and its British equivalent required the plaintiff to recall and replace all the faulty clutch assemblies. *Id.* at 985. In reversing the appeals court for barring the plaintiff's fraud and intentional misrepresentation claims based upon the economic loss rule, the California Supreme Court held that the plaintiff's claims were independent of the defendant's breach of contract. *Id.* at 991. But for the defendant's misrepresentations, the plaintiff "would not have accepted delivery and used the nonconforming clutches . . . nor would it have incurred the cost of investigating the cause of the faulty clutches . . . [a]ccordingly, [defendant's] tortious conduct was separate from the breach itself, which involved [defendant's] provision of the nonconforming clutches." *Id.* at 990-91. Additionally, the court noted the defendant's provision of faulty clutches exposed the plaintiff to "liability for personal damages if a helicopter crashed and to disciplinary action by the FAA." *Id.* (citing *Ehrlich*, 21 Cal. 4th at 553-54).

Here, but for defendants' alleged intentional misrepresentations and omissions relating to the high risk and then the existence of SE in their farms, hens, and eggs, plaintiff alleges it would not have accepted delivery of and sold the nonconforming eggs, nor would plaintiff have incurred the same amount of damages. (FAC ¶¶ 151-159.) Defendant's breach of contract involved selling nonconforming eggs from nonconforming farms; its tortious conduct involved, at least, its intentional failure to disclose that its farms, hens, and possibly eggs were infected with SE. Plaintiff pleads this intentionally tortious conduct clearly in the operative complaint: "Defendants failed to disclose problems at their farms to NuCal because they knew that NuCal would have stopped purchasing from defendants . . . ." (*Id.* ¶ 154.) Like the defendant in *Robinson*, defendant here has also allegedly exposed plaintiff to liability for personal damages for some of the 62,000 people who were sickened as a result of this SE

outbreak and to potential disciplinary action by government authorities, such as the Food and Drug Administration (FDA). (*See id.* ¶¶ 1, 15.) In short, the "economic loss rule is designed to limit liability in commercial activities that negligently or inadvertently go awry, not to reward malefactors who affirmatively misrepresent and put people at risk." *Robinson*, 34 Cal. 4th at 991 n.7.

Finally, defendants' conduct violated social policy such that tort remedies are appropriate. *Id.* at 991-92 ("[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." (quoting *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 107 (Cal. 1994)). However, courts should apply tort remedies only when a defendant's conduct is "so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce." *Id.* at 992 (quoting *Erlich*, 21 Cal. 4th4th at 554). Defendant's alleged conduct is a clear violation of social policy. Imposing tort liability is consistent with the policy goal of reassuring egg wholesalers, retailers, and consumers that the eggs they purchase are safe for consumption. Contract damages are insufficient here, as in *Robinson*, because "no rational party would enter into a contract anticipating that they are or will be lied to." *Id.* at 993. Additionally, "parties should be able to allocate risks regarding negligent product design or manufacture, [but] those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction." *Id.* (quoting Steven C. Tourek, Thomas H. Boyd & Charles J. Schoenwetter, *Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation*, 84 IOWA L. REV. 875, 909 (1999)).

Plaintiff's fraud claim may proceed in its entirety.

/////

/////

13

B.    Plaintiff's Express Warranty Claim (III) and Implied Warranty Claims (I-II)

1.    Express Warranty

Plaintiff purchased defendant's eggs through ECI, a commercial exchange. (FAC ¶ 79.) Plaintiff alleges all sellers using ECI are subject to an express warranty to comply with the FDA egg safety rule. (*Id.* ¶ 143.) After the FDA egg rule came into effect, plaintiff alleges ECI included clauses in its egg purchase confirmations requiring sellers to comply with FDA regulations concerning SE, including notifying ECI of positive SE tests, and to indemnify the Clearinghouse and its members for any damages incurred through failure to comply. (*Id.* ¶ 88.)

Defendant argues it made no express warranty to plaintiff about its eggs and it cannot be held to the affirmations of a third party. (ECF 70 at 9 (citing *Grinnell v. Charles Pfizer & Co.*, 79 Cal. Rptr. 369, 378 (Cal. Ct. App. 1969)).) Plaintiff counters that defendant's full knowledge that ECI purchase confirmations included indemnification clauses requiring that egg sellers notify ECI, and by extension plaintiff, of any SE positive tests is sufficient to serve as an affirmation for express warranty purposes. (ECF 97 at 15.) As defendant notes in reply, plaintiff cites no authority for the proposition that a facilitating third party's purchase confirmations are legally equivalent to a party's own affirmation. (ECF 114 at 11.)

"Under California law, any affirmation of fact or promise relating to the subject matter of a contract for the sale of goods, which is made part of the basis of the parties' bargain, creates an express warranty." *McDonnell Douglas Corp. v. Thiokol Corp.*, 124 F.3d 1173, 1176 (9th Cir. 1997) (citing CAL. COMM. CODE § 2313(1)(a)). California courts use a three-step approach to determine whether an express warranty was breached. *Id.* (citing *Keith v. Buchanan*, 220 Cal. Rptr. 392, 395 (Cal. Ct. App. 1985)). First, the court must decide whether the seller made "an affirmation of fact or promise" relating to the goods sold. *Id.* Second, the court must determine if the "affirmation or promise was 'part of the basis of the bargain.'" *Id.* (quoting *Keith*, 220 Cal. Rptr. at 395). Third, the court must determine if the seller breached the warranty. *Id.*

14

The court finds plaintiff's warranty claim fails as a matter of law. There is no evidence that defendant, as the seller, made an affirmation. Neither party cites a case that speaks to whether a seller can be held to an affirmation made by a third party but contained in a purchase confirmation to which the seller was a party. Defendant cites *Grinnell*, which only generally restates the requirement that the seller make an affirmation. 79 Cal. Rptr. at 378. The court has not been able to identify any helpful California legal precedent; moreover it is plaintiff that has the burden of demonstrating its claim is brought on a "cognizable" legal theory. *Balistreri*, 901 F.2d at 699. Plaintiff has not met its burden. Therefore, plaintiff's express warranty claim is dismissed.

    2.   Implied Warranties

Plaintiff also brings two implied warranty claims: implied warranty of merchantability and implied warranty of fitness. (FAC ¶¶ 130, 136.) Defendant argues plaintiff has failed to allege elements necessary to each claim. First, defendant avers plaintiff has failed to allege vertical privity, which is necessary to both implied warranty claims. (ECF 70 at 10.) Second, defendant asserts plaintiff has failed to allege reliance on defendant's skill in selecting particular eggs, which is required to prove a breach of implied warranty of fitness. (*Id.*) Plaintiff counters that it sufficiently pled vertical privity and that defendant admitted such privity exists in its answer. (ECF 97 at 15.) Defendant does not respond to this argument in its reply. Additionally, plaintiff argues it has sufficiently pled facts supporting its implied warranty of fitness claim. (*Id.* at 16.) Specifically, plaintiff pled that defendant knew plaintiff would sell some of the eggs it purchased from defendant as unbroken shell eggs, which must be free of SE because they are not pasteurized before human consumption. (*Id.*)

    i.   Vertical Privity

To succeed in an implied warranty claim, a plaintiff must "stand in vertical contractual privity with the defendant." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008). Vertical privity exists where a buyer and seller are in "adjoining links of

15

the distribution chain." *Id.* Thus, plaintiff's implied warranty claims survive this challenge if plaintiff pled it received eggs directly from defendant. Plaintiff has pled as much: despite being matched with defendant through the ECI, plaintiff alleges defendant sent the eggs directly to plaintiff, not through a third party. (FAC ¶ 80.) Defendant admitted as much in its answer (s*ee, e.g.*, ECF 72 ¶ 81 (admitting it sold approximately 125,265 eggs to NuCal in March and April 2010)), and abandoned the argument in its reply. The court finds vertical privity exists. The implied warranty of merchantability claim may proceed.

ii.   Implied Warranty of Fitness

The warranty of fitness for a particular purpose is implied by law when "a seller has reason to know that a buyer wishes goods for a particular purpose and is relying on the seller's skill and judgment to furnish those goods." *Martinez v. Matabolife Int'l, Inc.*, 6 Cal. Rptr. 3d 494, 189 (Cal. Ct. App. 2003). This warranty is breached when the goods are not reasonably fit for the intended purpose, causing injury. *Id.* The crux of the issue here is whether plaintiff purchased eggs from defendant for a "particular purpose" such that it relied on defendant's skill. Comment 2 to the relevant California statutory provision states:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

CAL. COMM. CODE § 2315, comment 2. This comment also instructs that a contract may include both a warranty of merchantability and of fitness for a particular purpose. *Id.*

The court finds this claim is inadequately pled. Eggs such as those at issue here are ordinarily used for human consumption, whether as a processed and pasteurized liquid or as unbroken shell eggs. Plaintiff does not allege, nor could the court accept, that buying eggs to be repackaged and sold to consumers as unbroken shell eggs is "peculiar to the nature" of plaintiff's

16

business. *See, e.g.*, *Mathison v. Bumbo*, No. SA CV08–0369 DOC (Anx), 2008 WL 8797937, at *11 (C.D. Cal. Aug. 18, 2008) ("There is nothing peculiar about using a baby seat to secure infants and toddlers.") (internal quotations omitted). Rather, this ordinary purpose of repackaging eggs is envisaged in the concept of general merchantability. Plaintiff does not allege that it purchased eggs from defendant for any reason other than to resell them as unbroken shell eggs. Plaintiff's implied warranty of fitness claim is dismissed.

   C. Plaintiff's Fraud and Unfair Competition Claims (IV and VIII)

    Defendant avers plaintiff's fraud and unfair competition claims do not meet Federal Rule of Civil Procedure 9(b)'s ("Rule") heightened pleading standard. (ECF 70 at 12-13.) Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake" when a plaintiff is alleging fraud or mistake. Defendant further argues plaintiff, who is bringing a fraud claim against multiple defendants, must set forth the alleged conduct attributable to each defendant; "everyone did everything" allegations are insufficient. (*Id.* at 12 (citing *Swartz v. KPMG, LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007)).) Plaintiff's pleading fails because it contains only "group allegations," defendant says. (*Id.*) Finally, defendant asserts the heightened pleading standard also applies to plaintiff's unfair competition claim because plaintiff's unfair competition claim is premised upon its fraud claim. (*Id.* at 12-13 (citing *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1098 (N.D. Cal. 2010)).) Thus, plaintiff's unfair competition claim fails for the same reason its fraud claim does.

    Plaintiff argues its fraud allegations meet Rule 9(b)'s heightened standard. (ECF 97 at 17.) It contends defendant misapprehends *Swartz*'s assertion: plaintiff need not identify false statements made by each defendant, but must only, at a minimum, "identify the role of each defendant in the alleged fraudulent scheme." (*Id.* (citing *Swartz*, 476 F.3d at 764-65).) Plaintiff asserts it did just that, despite the difficulty in determining which entity did what given the overlap between ownership and management of the defendant businesses in this action. (*Id.* at 18 (citing FAC ¶¶ 26-34, 40-42, 72-77, 80-83).) Plaintiff also contends its unfair competition

claim is not subject to Rule 9(b) because it does not rely solely on alleged fraudulent conduct as its premise. (*Id.* (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).)

        1.       Plaintiff's Fraud Claim Satisfies Rule 9(b)

Plaintiff appears to allege two theories of fraud: intentional concealment/omission and intentional misrepresentation. (FAC ¶¶ 153-159.) When pleading common law fraud, Rule 9(b) requires "more specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz*, 476 F.3d at 764 (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). The purpose of Rule 9(b)'s heightened pleading standard is to "give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so they can defend against the charge and not just deny that they have done nothing wrong." *Id.* (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001); internal quotations omitted). When suing multiple defendants, a plaintiff must "at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'" *Id.* at 765 (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

Plaintiff has met Rule 9(b)'s heightened pleading requirement. It alleges defendant's manager, Tony Wasmund, discussed with others the ongoing SE problem at defendant's farms on May 28, 2010. (FAC ¶¶ 43, 72-76.) Plaintiff sets out the content of these discussions in several pages of the FAC, in the form of quotations and other related details. (*Id.* ¶¶ 72-76.) Plaintiff then alleges defendant intentionally and knowingly concealed the SE contamination from plaintiff and regulators and continued to ship eggs to plaintiff as late as July 2010. (*Id.* ¶¶ 77, 80-83.) These allegations specifically name defendant Quality Egg, or sometimes "Wright County Egg," whose orders from plaintiff, plaintiff alleges, were shipped to plaintiff directly from defendant. (*Id.* ¶¶ 80-83.) These allegations are sufficiently specific: they provide the time, place, specific content of defendant's knowledge from which an omission can be inferred, and the identities of the parties to the misrepresentation. *Swartz*, 476 F.3d at 764.

18

Defendant has been given sufficient notice of what constitutes the alleged fraud such that it can properly defend the charge. *Id.* Plaintiff cannot logically be required to provide a false statement made by defendant when plaintiff is pleading an illegal omission, which by definition intimates a statement should have been made but was not. (*See* ECF 114 at 13.) Inasmuch as plaintiff's intentional misrepresentation theory of fraud rests upon defendant's false representation that it would comply with the FDA egg rule, plaintiff has also met its Rule 9(b) burden. (*Id.* ¶ 156.) Plaintiff alleges defendant intentionally misrepresented, through its participation in the ECI exchange, that it would comply with the FDA egg safety rule. (*Id.* ¶¶ 84-86, 156.) Defendant does not contend this particular theory fails as a matter of law. Hence, plaintiff's fraud claim may proceed under either theory.

        2.        Plaintiff's Unfair Competition Claim Survives

To the extent plaintiff's unfair competition claim is premised upon its fraud claim, the unfair competition claim is adequately pled because plaintiff's fraud claim satisfies Rule 9(b). To the extent plaintiff's claim is premised upon other violations of law, plaintiff's compliance with Rule 9(b) is irrelevant. *Vess*, 317 F.3d at 1106 (upholding unfair competition claim despite plaintiff's failure to satisfy Rule 9(b) because plaintiff's allegations do not rely entirely on fraud). Plaintiff's unfair competition claim survives.

    D.    Leave to Amend

Courts should consider four factors when considering leave to amend: 1) undue delay; 2) bad faith; 3) futility of amendment; and 4) prejudice to the opposing party. *Levine v. Safeguard Health Enterprises, Inc.*, 32 F. App'x 276, 278 (9th Cir. 2002) (internal citations and quotations omitted). In this order, the court dismisses plaintiff's express warranty and implied warranty of fitness claims in their entirety. The court also dismisses plaintiff's negligence claims insofar as they seek to recover for damages that are not for physical damage to other property. Although this case has been pending for more than two years, plaintiff has not shown bad faith. The opposing parties would not be unduly prejudiced if plaintiff were given leave to amend.

However, the court finds the third factor weighs most heavily here: given the reasons for dismissing certain claims in whole or in part, the court finds amendment would be futile. Leave to amend is denied.

III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part, as follows:

1. Plaintiff's negligence claims (V and VII) may proceed only as to physical damage to other property, as described in this order;
2. Plaintiff's express warranty claim (III) and implied warranty of fitness claim (II) are dismissed with prejudice in their entirety; and
3. Leave to amend is denied.

The court further ORDERS that:

1. Plaintiff file amended pleadings consistent with this order by February 15, 2013; and
2. The status conference set for February 21, 2013 is vacated and reset for March 7, 2013.

IT IS SO ORDERED.

DATED: January 14, 2013.

_____
UNITED STATES DISTRICT JUDGE