1   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
    WILLIAM M. GOODMAN (SBN 61305)
2   WGoodman@kasowitz.com
    JASON S. TAKENOUCHI (SBN 234835)
3   JTakenouchi@kasowitz.com
4   101 California Street, Suite 2300
    San Francisco, CA 94111
5   Telephone:  (415) 421-6140
    Facsimile:  (415) 398-5030
6
7   Attorneys for Plaintiff NUCAL FOODS, INC.

8                  UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  NUCAL FOODS, INC., a California          Case No.: 2:10-CV-03105-KJM-CKD
    cooperative,
12                                           **SECOND AMENDED COMPLAINT**

13                          Plaintiff,
                                             **Jury Trial Demanded**
14          v.

15  QUALITY EGG LLC, an Iowa limited liability
16  company; HILLANDALE FARMS OF IOWA,
    INC., an Iowa corporation; HILLANDALE
17  IOWA LLC, an Iowa limited liability company;
    HILLANDALE FARMS OF PA, INC., a
18  Pennsylvania corporation;,

19                          Defendants.

20

21

22

23

24

25

26

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**SUMMARY OF CASE**

1.    In August 2010 defendants Quality Egg LLC and Hillandale Farms of Iowa initiated a massive recall of shell eggs.  The recall was prompted by an outbreak of Salmonella Enteritidis ("SE"), a food-borne bacteria.  The U.S. Food and Drug Administration (FDA) later estimated that as many as 62,000 people were sickened during the outbreak.

2.    According to the U.S. Centers for Disease Control (CDC), "[a] person infected with Salmonella Enteritidis usually has fever, abdominal cramps, and diarrhea beginning 12 to 72 hours after consuming a contaminated food or beverage.  The illness usually lasts 4 to 7 days, and most persons recover without antibiotic treatment.  However, the diarrhea can be severe, and hospitalization may be required.  The elderly, infants, and those with impaired immune systems may have a more serious illness.  In these patients, the infection may spread from the intestines to the blood stream, and then to other body sites and can cause death unless the person is treated promptly with antibiotics."

3.    Past outbreaks of Salmonella, and SE in particular, have killed people who consumed tainted eggs.  Austin "Jack" DeCoster ("Jack DeCoster"), who controlled defendant Quality Egg's operations in Iowa, has been associated with such deadly outbreaks in the past. (**EXHIBIT 1**.)

4.    At the time of the recall, and in later testimony before Congress, the defendants said they were surprised by the SE outbreak and their farms' role in it.

5.    The defendants had no reason to be surprised.  In fact, no later than March 2010 the managers of the defendants' Iowa farms knew that many of their chicken houses were contaminated with SE.

6.    In fact, in early 2010, months before the recall, environmental tests at *every one* of the defendants' farms showed SE contamination.  (**EXHIBIT 2**.)  By April 2010, the veterinary

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

team hired by the defendants estimated that <u>43%</u> of houses at the farms were infected with SE. The infected laying farms, or "layers," included:

    a.    Layer 1, which had SE positive tests in March, June and July 2010.

    b.    Layer 2, which had SE positive tests in March, April, June and July 2010.

    c.    Layer 3, which had SE positive tests in April, June and July 2010.

    d.    Layer 4, which had SE positive tests in March, April, June and July 2010.

    e.    Layer 5, which had SE positive tests in June 2010.

    f.    Layer 6, which had SE positive tests in June and July 2010.

    g.    Layer 9, which had SE positive tests in June 2010.[1]

    7.    No later than June 2010, defendants also learned that chicken carcasses at several farms had tested positive for SE.  The defendants' own veterinary specialists would later admit that the presence of SE in the internal organs of laying hens meant that SE "is almost certainly in the eggs at this site."  (**EXHIBIT 3**.)

    8.    Other tests revealed that the defendants' farms for young hens, called pullets, were also infected with SE.  These tests, like the others described above, were conducted in the weeks and months leading up to the recall.  (**EXHIBIT 4**.)  The infected pullet farms included:

    a.    Pullet 1, which had SE positive tests in June 2010.

    b.    Pullet 2, which had SE positive tests in June 2010.

    c.    Pullet 3, which had SE positive tests in June 2010.

    d.    Pullet 4, which had SE positive tests in early July 2010.

    e.    Pullet 6, which had SE positive tests in early August 2010.

    f.    Pullet 8, which had SE positive tests in June and early August 2010.

---

[1] Some of the reports showing SE contamination at the defendants' facilities, and in the chickens at those facilities, are attached hereto as Exhibits 2 and 4.  These documents were retrieved from

SECOND AMENDED COMPLAINT

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

9.      Despite these test results, and the serious public health risk posed by SE, the defendants continued to sell eggs from contaminated farms, and from contaminated hens, from March 2010 to August 2010.  The defendants gave no warnings to regulators, egg purchasers, or to the egg consuming public, and they did not even attempt to test eggs from contaminated farms and hens before sending those eggs out to be consumed.

10.     In May 2010 the defendants discussed plans to address the contamination, starting with "the farms with current SE positive results."  However, in order to maintain their profits from the contaminated farms, the defendants decided that they would not decontaminate any laying house or pullet house until that particular house was emptied as part of the usual process of rotating aging laying hens.  In other words, the defendants refused to allow SE contamination to interfere with their business of selling eggs, regardless of the danger to customers and the public.

11.     At that time, the defendants suspected that Midwest Hatchery & Poultry Farms Inc., a Minnesota farm that provided chicks to the Iowa pullet farms, may have been the source of Salmonella contamination.   In fact, no later than April 2010 the defendants' agent, Tony Wasmund, knew that hundreds of samples from Midwest Hatchery's farms had tested positive for Salmonella.  (**EXHIBIT 5**)  Follow-up tests showed that the farms were contaminated with Salmonella Heidelberg – a different strain of Salmonella that causes illness similar to SE, that can also be transmitted from chicken to egg, and that was also found in the defendants' Iowa farms in 2010.  Salmonella Heidelberg has been linked to multiple outbreaks in eggs and other products, including a recent outbreak in turkey products that has resulted in at least one reported death.

12.     Despite these test results, there is no indication that defendants stopped purchasing chickens from Midwest Hatchery, or culled chickens from Midwest Hatchery out of their pullet or laying farms.   The defendants gave no warnings to regulators, egg purchasers, or to the egg

Iowa State University's Veterinary Diagnostic Laboratory.

SECOND AMENDED COMPLAINT

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

consuming public, about the problems at Midwest Hatchery.  Defendants' continued purchases from Midwest Hatchery's contaminated facilities may have contributed to the continued contamination of the defendants' Iowa egg farms with Salmonella Heidelberg in late 2010, long after the Iowa egg recall ended.  (**EXHIBIT 6.**)

13.     The defendants continued to find SE contamination in their Iowa farms in June 2010, with tests showing SE in every one of their laying farms and almost all of their pullet farms. Defendants had those test results in hand when new federal egg safety rules went into effect on July 9, 2010.  Those rules required that farms either (1) divert eggs from SE positive farms to pasteurization at egg breaking facilities, or (2) hold the eggs out of the market until egg tests showed there was no SE in the eggs from the contaminated farm.  Defendants took neither of these required steps.  Despite scores of positive SE tests, in laying houses and in the chickens themselves, the defendants performed only one egg test before the recall (that sample was taken on August 5), and there is no indication they withheld any eggs from the tainted farms from the market before the recall.

14.     Defendants also ignored their duty to notify purchasers of positive SE tests, thereby allowing potentially contaminated eggs to continue to circulate in the country's stores and restaurants.  Instead the defendants continued to ship eggs, and failed to notify customers of both past and ongoing contamination at their farms and in their laying hens.

15.     It was only after the federal Food and Drug Administration (FDA) approached the defendants on August 9, 2010, that the defendants took action.  The FDA's inquiry concerned defendants' possible ties to an outbreak of SE that began months earlier.  Even after learning of the outbreak, the defendants initially refused to give the FDA the test reports and samples that would have allowed the FDA to fully address the scope of SE contamination in the food supply.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

When the FDA found some earlier reports with SE positive tests, the defendants suggested the SE positive tests were linked to a vaccination program.

16.     After the FDA began pursuing the defendants' links to the outbreak, the defendants' farms began shell egg tests.  The tests, which covered only a small portion of the eggs being produced at the defendants' farms, found about 170 SE positive eggs.  And in several of the 50-egg batches that were tested, the testers discovered multiple eggs that were contaminated with SE.  (**EXHIBIT 7.**)  Had the FDA not initiated an investigation, defendants would have sold these contaminated eggs, along with potentially thousands of other contaminated eggs, to consumers across the country.

17.     On September 22, 2010, executives from the defendants' companies testified under oath before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, about the recall.  Despite the fact that such information was responsive to questions asked by the subcommittee, these executives did not mention the fact that they had known about widespread SE contamination at their farms, and inside their laying hens, for months before the recall.  Nor did they mention that they had withheld important information from the FDA when it was investigating the recall, including Salmonella samples that could have allowed regulators to determine whether other strains of Salmonella from the defendants' farms were associated with separate outbreaks in 2010.  Nor did the defendants discuss the possible link between the SE outbreak in Iowa and a Minnesota chicken breeding operation with the same parent company as Quality Egg LLC.  Nor did the defendants disclose that the SE outbreak could have been related to their practice of recycling egg shells from their contaminated farms to use as a feed ingredient for their chickens.

18.     At the hearing Orland Bethel, CEO of defendant Hillandale Farms of Iowa, invoked his Fifth Amendment right against self-incrimination when he was asked about problems

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  at Hillandale's farms.   Hillandale manager Duane Mangskau testified that, when the FDA

2  approached the company about its farms' possible link to an SE outbreak, he was "shocked by the

3  allegation."   In fact, and contrary to Mangskau's testimony, in April 2010 Mangskau personally

4  collected some of the Iowa farm samples that were later found to be SE-positive.

5       19.      In November 2010, Ohio Fresh Eggs LLC ("Ohio Fresh"), an Ohio egg farm

6  owned and managed by individuals and entities related to the defendants, declared a recall due to

7  SE contamination.   The Ohio recall was caused by the same practices and problems that led to the

8  recall at the defendants' Iowa farms.   As with the Iowa recall, the Ohio farm ignored positive SE

9  tests, and sold tainted eggs for public consumption without warning counterparties, regulators, or

10  the public about the danger posed by these eggs.   (**EXHIBIT 8.**)

11       20.      The defendants' intentional misconduct throughout 2010 – from failing to address

12  widespread SE contamination in the Iowa farms and chickens, to failing to address widespread

13  Salmonella contamination at related facilities that provided chicks to the Iowa farms, to

14  misleading regulators and the public – constituted a pattern and practice of hiding the true

15  conditions at their farms from customers, regulators and the public, so that the defendants could

16  continue to profit from their contaminated farms.

17       21.      Plaintiff NuCal Foods Inc. ("NuCal"), a farming cooperative based in Ripon,

18  California, purchased the defendants' tainted eggs from March 2010 to July 2010.   After the recall,

19  NuCal suffered lost sales, reputational and economic harm, and other damages.   NuCal files this

20  suit for indemnification and recovery of its losses, for damages to NuCal from the defendants'

21  negligence and misconduct, and for restitution of the defendants' ill-gotten gains.   NuCal also

22  seeks punitive damages for the defendants' fraudulent conduct.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

## JURISDICTION AND VENUE

22.     This Court has jurisdiction under 28 U.S.C. Section 1332, in that this is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of interests and costs, the sum of $75,000 either individually or jointly as to each defendant.

23.     Venue is proper in this court pursuant to 28 U.S.C. Section 1391, as a substantial part of the events giving rise to the action occurred in this District, and a substantial part of the property that is the subject of the action is in this District.

## THE PARTIES

24.     Plaintiff NuCal is an agricultural cooperative with its principal place of business at 720 South Stockton Ave, Ripon, California.  NuCal processes over 7.5 million eggs per day from its 11 family farms and 7 processing plants in Northern California.  NuCal has been providing farm fresh eggs to retail and foodservice customers in Northern California for over 50 years.

25.     The defendants described below were involved in the operation of seven Iowa egg farms that sold eggs to NuCal and others across the country.  The farms at issue are Layers 1, 2, 3, 4, 6, the Alden Farm (Layer 5) and the West Union Farm (Layer 9).  One of more defendants was also linked to a Minnesota chicken-raising operation that sold chicks to the Iowa farms in 2009 and 2010.

### A.     The DeCoster Parties

26.     Defendant Quality Egg LLC ("Quality Egg") is an Iowa limited liability company with its principal place of business at 2674 Highway 69, Galt, Iowa.  At all times relevant hereto, Quality Egg, either directly or through its subsidiaries and related entities, was engaged in the business of producing and selling shell eggs to wholesale and retail customers nationally.  Quality Egg, either directly or through its subsidiaries and related entities, operated Layers 1, 2, 3, 4 and 6.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Quality Egg jointly operated Layers 5 and 9 with Hillandale Farms of Iowa, as described more fully below.

27.     DeCoster Revocable Trust ("DeCoster Trust") is an Iowa revocable trust, dated May 19, 2000, that through one or more of its owned businesses was, during the relevant period, engaged in the producing and selling of shell eggs to wholesale and retail customers nationally. On information and belief, the DeCoster Trust owned and/or controlled Quality Egg during the relevant period.

28.     Austin "Jack" DeCoster ("Jack DeCoster") is, on information and belief, a resident of Clarion, Iowa.  Jack DeCoster is the trustee of DeCoster Revocable Trust.  Jack DeCoster had ultimate authority over Quality Egg's Iowa operations, and was aware of SE contamination at the Iowa farms.

29.     DeCoster Enterprises LLC ("DeCoster Enterprises") is a Delaware limited liability company with a corporate office at 2674 Highway 69, Galt, Iowa (the same location as Quality Egg's home office).  On information and belief, DeCoster Enterprises controlled and/or managed the DeCoster Trust during the relevant period.

30.     Environ/Wright County Inc. ("Environ") is an Iowa corporation involved in the production and sale of shell eggs, with a home office at 2674 Highway 69, Galt, Iowa.  Environ was involved in the processing and sale of the recalled eggs from one or more of the Iowa farms.

31.     Defendant Quality Egg, DeCoster Trust, Jack DeCoster, DeCoster Enterprises and Environ (collectively the "DeCoster Parties") were part of a unified egg farming enterprise that included the raising of chickens, the operation of laying farms, and the marketing and sale of eggs. (**EXHIBIT 9.**)  This egg enterprise included the operation of Layers 1, 2, 3, 4, 5, 6 and 9 in Iowa.

32.     The DeCoster Parties's operation used the fictitious business name "Wright County Egg" in their dealings with egg purchasers such as NuCal.  When egg purchasers did business with

1   Wright County Egg, they were receiving eggs produced by one or more of the DeCoster Parties,

2   which had in turn been produced in facilities owned by one or more of the DeCoster Parties from

3   chickens raised by one or more of the DeCoster Parties.  The proceeds from these purchases were

4   then funneled back to the DeCoster Parties's consolidated operation.

5   33.   One or more of the DeCoster Parties also used the business names "DeCoster Egg

6   Farms of Iowa" and "DeCoster Farms" to refer to their unified farming operation.   Neither

7   DeCoster Egg Farms of Iowa nor DeCoster Farms is registered with the Iowa Secretary of State.

8   On information and belief, DeCoster Egg Farms of Iowa and DeCoster Farms are not separate

9   legal entities, but are rather fictitious business names used by one or several of the DeCoster

10  Parties.  For example, Jack DeCoster has conducted business in Iowa using the business name

11  DeCoster Farms, and his son, Peter DeCoster, has listed his employer as DeCoster Egg Farms of

12  Iowa in regulatory filings.

13  34.   The DeCoster Parties shared common ownership, managers and interests.  *See*

14  Exhibit 9.  At all relevant times, each of the DeCoster Parties was the agent of each of the other

15  DeCoster Parties with respect to the misconduct alleged herein.

16  **B.   The Hillandale Defendants**

17  35.   Defendant Hillandale Farms of Iowa ("Hillandale Farms") is an Iowa corporation

18  with its principal place of business at 19 ½ West Main Street, New Hampton, Iowa.  At all times

19  relevant hereto, Hillandale Farms was engaged in the business of manufacturing and selling shell

20  eggs to customers nationally.  Hillandale Farms is owned by Orland Bethel (the majority owner),

21  Gary Bethel, and Gary Bartness.  On information and belief Hillandale Farms leased the Alden

22  Farm (Layer 5) from defendant Quality Egg.  The two entities (Hillandale Farms and Quality Egg)

23  jointly operated the Alden Farm, but Hillandale Farms's related entities marketed and sold the

24  eggs produced at the farm.  Hillandale also employed the workers at the farm.  As part of their

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

joint management and operation of the Alden Farm, Hillandale Farms and Quality Egg had managers in common.

36.     Hillandale Farms had operational control over the Alden Farm.  In fact, in 2009 Hillandale Farms assured its customers that "[t]he personnel and management will be Hillandale employees…This will be a Hillandale facility, but the land and buildings will be leased." (**EXHIBIT 10.**)  Hillandale Farms also certified to customers that the Alden Farm would comply with the FDA egg rule.

37.     Defendant Hillandale Farms of Pennsylvania ("Hillandale PA") is a Pennsylvania corporation with its principal place of business in North Versailles, Pennsylvania.  Hillandale PA is owned by Orland Bethel.  Hillandale PA sold the eggs to NuCal that were later recalled by Hillandale Farms.

38.     Defendant Hillandale Iowa LLC ("Hillandale LLC") is an Iowa limited liability company with its home office at 13706 230th Street, West Union, Iowa.  On information and belief, Hillandale Iowa LLC processed and shipped the eggs that Hillandale PA sold to NuCal before the recall.

39.     Hillandale Farms, Quality Egg, Hillandale PA and Hillandale LLC shared common managers and interests with respect to the Alden Farm.  At all relevant times, each of them was the agent of each of the other with respect to the misconduct alleged herein related to the Alden Farm.

## <u>RELATED ENTITIES</u>

40.     Midwest Hatchery & Poultry Farms Inc. ("Midwest Hatchery") is a Minnesota corporation.  Midwest Hatchery provided chickens to the Iowa farms in 2010, and possibly in 2009.  On information and belief, Midwest Hatchery is owned, either directly or indirectly, by defendant DeCoster Enterprises.  Tony Wasmund, a manager of Quality Egg, is also a manager of Midwest Hatchery.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

41.   Iowa-Minnesota Management LLC ("Iowa-Minnesota Management") is an Iowa limited liability company with a home office at 2674 Highway 69, Galt, Iowa.  On information and belief, Iowa-Minnesota Management owns Midwest Hatchery.  On information and belief, Iowa-Minnesota Management is owned, either directly or indirectly, by DeCoster Enterprises.

42.   Galt Real Estate LLC ("Galt Real Estate") is an Iowa limited liability company with a home office at 2674 Highway 69, Galt, Iowa.  On information and belief, Galt Real Estate owned the land and/or facilities at one or more of the DeCoster Parties's egg farms.

43.   Hillandale Iowa II, LLP ("Hillandale Iowa II") is an Iowa limited liability partnership with a principal place of business at 13706 230th Street, West Union, Iowa.  On information and belief, Hillandale Iowa II produced eggs at the West Union Farm (Layer 9). Hillandale Iowa II's managers included Tony Wasmund, who was also a manager and agent of Quality Egg and Hillandale Farms.  On information and belief, defendant Hillandale LLC owned 10% of Hillandale Iowa II at all relevant times.

44.   W.U. Laying Investment LLC ("W.U. Laying") is an Iowa limited liability company with its principal place of business at 13706 230th Street, West Union, Iowa (the same address as Hillandale Iowa II and Hillandale LLC).  On information and belief, W.U. Laying owned 90% of Hillandale Iowa II at all relevant times.

45.   Hillandale Iowa II, W.U. Laying, DeCoster Trust, Hillandale LLC, and Hillandale Farms were part of a consolidated egg enterprise that operated Layer 9 (the West Union Farm).

46.   NuCal is still investigating whether it received eggs from the West Union Farm, and whether the entities that owned and operated the West Union farm are otherwise involved in the acts alleged against the defendants herein.

47.   Boomsma's Inc. ("Boomsma") is an Iowa corporation.  On information and belief, Boomsma owned the facilities at the Alden Farm before the recall.

48.     John Glessner ("Glessner") is an individual with a control, ownership and/or management interest in several egg farming entities.  On information and belief, before the recall Glessner owned the Alden Farm laying hens either directly or through companies he controlled.  Glessner was a manager of the Iowa farms before and after the recall, and participated in decisions about SE testing, SE contamination, and the recall.  Glessner was also CEO of Ohio Fresh Eggs until June 2011.

## **GENERAL ALLEGATIONS**

I.     **In Early 2010, Months Before The Recall, The Defendants Learn Of Widespread Salmonella Enteritidis Contamination At Their Laying Farms, Pullet Farms, And In Their Chickens.**

   A.     **Defendants learn about potential Salmonella enteritidis contamination at several farms in February 2010; scientists confirm Salmonella enteritidis contamination in March 2010.**

49.     In January 2010 the managers of the defendants' Iowa farms collected environmental samples from several Layers, including Layers 1, 2, 3, 4 and 5.  The defendants sent these samples, under the names "Decoster Farms of Iowa" and "Decoster Farms," to Iowa State University's Veterinary Diagnostic Lab ("ISU VDL") for analysis.  This initial sample set was designated Accession No. 2010002050.[2]

50.     On February 15, 2010, the ISU VDL issued an initial report stating that Salmonella was found in the samples, including Salmonella serogroup D.  *See* Exhibit 2.  Serogroup D includes, and is usually found to be, Salmonella enteritidis.

51.     On March 4, 2010, the ISU VDL issued a report confirming the presence of SE in several samples from Layers 1, 2, and 4.  Around that time ISU VDL scientist Dr. Timothy Frana

---

[2] The Iowa State University Veterinary Diagnostic Lab gave each set of samples a unique "Accession" number for tracking purposes.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

told defendants' egg farm manager Tony Wasmund that Frana's colleague, Dr. Darrell Trampel, was available to "consult on SE eradication measures." (**EXHIBIT 11.**)

      **B.**      **Defendants find Salmonella enteritidis at every one of their farms; by April 2010 the farms' testing lab estimated that 43% of laying houses at defendants' farms were contaminated with Salmonella enteritidis.**

52.     In the weeks and months that followed these first positive SE tests, defendants submitted scores of additional environmental samples to the ISU VDL.  Tests on those samples revealed that *every one of the defendants' farms* had one or more contaminated laying houses.  *See* Exhibit 2.

53.     Positive SE results at laying farms included, but were not limited to, the following:

      a.      Accession No. 2010006456, from samples received March 8, 2010.  On April 22, 2010 the ISU VDL confirmed the presence of SE in a sample from Layer 2.

      b.      Accession No. 2010007173, from samples received March 15, 2010.  On April 20, 2010, the ISU VDL confirmed the presence of SE in samples from Layers 2 and 3.

      c.      Accession No. 2010008705, from samples received March 29, 2010.  On June 3, 2010, the ISU VDL confirmed the presence of SE in a sample taken from Layer 6.

      d.      Accession No. 2010011849, from samples received April 26, 2010.  On June 4, 2010, the ISU VDL confirmed the presence of SE in several samples taken from Layer 9 (the West Union Farm).

      e.      Accession Nos. 2010014357, 2010014358, 2010014360, 2010014806, 2010014807, 2010014848, and 2010014849, from samples received in mid-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

May 2010.  On June 24, 2010, the ISU VDL confirmed the presence of SE in several samples from Layers 1, 2, 3 and 4.

f.      Accession Nos. 2010015727 and 2010015944, from samples received May 28 and June 1, 2010, respectively.  On June 24, 2010, the ISU VDL confirmed the presence of SE in several samples taken from Layer 5 (the Alden Farm).

g.      Accession Nos. 2010017322, 2010017351, 2010017352, 2010017544, 2010017549, 2010017550, from samples received in mid-June 2010.  On July 22, 2010, the ISU VDL confirmed the presence of SE in several samples taken from Layers 1, 2, 4, and 6.

54.     Defendants also submitted samples from their pullet farms.  Test results showed that most of the pullet farms were also contaminated with SE.  *See* Exhibit 4.

55.     Positive SE results at pullet farms included, but were not limited to, the following:

a.      Accession No. 2010009471, from samples received April 5, 2010.  On June 3, 2010, the ISU VDL confirmed the presence of SE in samples from Pullets 1, 2 and 3.

b.      Accession No. 2010012672, from samples received May 3, 2010.  On June 11, 2010, the ISU VDL confirmed the presence of SE in samples from Pullets 2 and 3.

c.      Accession No. 2010016136, from samples received June 2, 2010.  On July 7, 2010, the ISU VDL confirmed the presence of SE in samples from Pullet 4.

d.      Accession No. 2010016512, from samples received June 4, 2010.  On June 24, 2010, the ISU VDL confirmed the presence of SE in samples from Pullet 8.

e.      Accession No. 2010018908, from samples received June 29, 2010.   On August 3, 2010, the ISU VDL confirmed the presence of SE in samples from Pullet 6.

56.     On information and belief, defendants were notified of these results, but did not initiate egg tests or SE decontamination in response.  This intentional misconduct was consistent with the defendants' pattern and practice of hiding the true conditions at their farms from customers, regulators and the public, so that the defendants could continue to profit from their contaminated farms.

57.     By April 27, 2010, ISU VDL scientists estimated that, based on the defendants' farm samples submitted so far, "[a]bout 43% of the houses" were SE positive.  (**EXHIBIT 12.**)

C.    **<u>No later than April 2010, defendants know that Midwest Hatchery facilities – the primary source of young chickens for the Iowa farms – are contaminated with Salmonella.</u>**

58.     In the months before the recall, the defendant farms purchased chickens from Midwest Hatchery, despite numerous and ongoing reports that Midwest Hatchery was contaminated with Salmonella.

59.     On March 30, 2010, Tony Wasmund submitted several sets of environmental samples from Midwest Hatchery's facilities to the University of Minnesota Veterinary Diagnostic Laboratory ("UM VDL").  *See* Exhibit 5.  Those tests showed that another type of Salmonella associated with food borne illnesses, Salmonella Heidelberg, was running rampant at the facilities.  Salmonella Heidelberg, like SE, can be transmitted from laying hens into the hens' eggs.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

a.      For one set (Case No. M10-014232), the laboratory found 67 environmental samples were positive for Salmonella Heidelberg.

b.      For another set (Case No. M10-014233), the laboratory found 40 environmental samples were positive for Salmonella Heidelberg.

c.      For another set (Case No. M10-014234), the laboratory found 69 environmental samples were positive for Salmonella Heidelberg.

60.      On April 6, 2010, Tony Wasmund submitted further sets of environmental samples from Midwest Hatchery's facilities to the UM VDL.

a.      For one set (Case No. M10-015532), the laboratory found that 3 of 5 environmental samples were positive for Salmonella Heidelberg.

b.      For another set (Case No. M10-015533), the laboratory found that 3 of 3 environmental samples were positive for Salmonella Heidelberg.

61.      Around this time, pullets at the defendants' farms also tested positive for Salmonella serogroup B, which includes Salmonella Heidelberg.  For example, an ISU VDL report on May 27, 2010, found that 61 environmental samples from Iowa pullet farms were positive for Salmonella serogroup B.  *See* Ex. 2.

62.      The defendants' layer farms also tested positive for Salmonella Heidelberg in early 2010.  For example, the ISU VDL found that environmental samples from Layer 1, received May 17, 2010, were positive for Salmonella Heidelberg (Accession No. 2010014358).  *See* Ex. 2.

63.      Several other environmental samples from Midwest Hatchery's facilities tested positive for Salmonella in April and May 2010.  There is no indication that Midwest Hatchery took any measures to cleanse its facilities of this contamination, or to prevent the transmission of it to the Iowa layer farms.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

64.     After the recall, on October 8, 2010, the FDA warned Tony Wasmund and "Wright County Egg" that Salmonella Heidelberg could be transferred from infected hens to their eggs. The FDA wrote: "Five pullet houses tested positive for Salmonella Heidelberg (SH), which has been associated with transovarian transmission.  What do you intend to do about the Salmonella Heidelberg detected in your pullet houses?"  The FDA later instructed "Wright County Egg" to test its facilities for Salmonella Heidelberg as well as SE.  (**EXHIBIT 13.**)

65.     It is unclear if Wasmund or any of the defendants told the FDA about the widespread Salmonella Heidelberg contamination at Midwest Hatchery.  And records show that Midwest Hatchery's facilities continued to test positive for Salmonella Heidelberg through the end of 2010 and into 2011.  *See* Exhibit 5.  For example:

a.     On December 22, 2010, the UM VDL determined that 63 environmental samples collected by Midwest Hatchery in November 2010 were Salmonella Heidelberg positive (Case No. M10-053030).

b.     On February 3, 2011, the UM VDL determined that 18 environmental samples collected by Midwest Hatchery in December 2010 were Salmonella Heidelberg positive (Case No. M10-055982).

66.     Despite this widespread and ongoing Salmonella Heidelberg contamination at Midwest Hatchery's facilities, and FDA warnings about the dangers posed by Salmonella Heidelberg, Quality Egg and "DeCoster Farm of Iowa" continued to purchase chickens from Midwest Hatchery through at least December 2010.  *See* Exhibit 6.  This intentional misconduct was consistent with the defendants' pattern and practice of hiding the true conditions at their farms from customers, regulators and the public, so that the defendants could continue to profit from their contaminated farms.

**D.** **In May and June 2010, defendants learn that SE is in the internal organs of chickens at their laying houses, meaning that those chickens were almost certainly laying eggs infected with Salmonella enteritidis.**

67.     On April 26, 2010, the defendants submitted dead chickens from Layer 6 for testing, in response to high mortality at the farm.  On May 1, 2010, Dr. Trampel of the VDL notified Wasmund that the lab found Salmonella serogroup D in the livers of the chickens.  Dr. Trampel noted that serogroup D Salmonella "isolated from laying hens usually is identified as being Salmonella enteritidis."  (**EXHIBIT 14.**)  Dr. Trampel said the samples would be tested further by a national lab to confirm the presence of Salmonella enteritidis.  That national lab, the National Veterinary Services Laboratories (NVSL), confirmed on June 4, 2010, that the internal organs were contaminated with Salmonella enteritidis.

68.     It is well known in the industry that if a laying hen has SE in its internal organs, it is almost certain to be laying eggs infected with SE.  ISU VDL scientist Dr. Trampel confirmed this in a May 1, 2010, email, stating that "If SE is in the livers of the laying hens, it is almost certainly in the eggs at this site."  *See* Exhibit 3.

69.     On May 11, 2010, Dr. Trampel emailed Wasmund with the results of separate tests of dead chickens from Layers 3, 5 (Alden Farm), and 6.  In each case, Dr. Trampel reported that serogroup D Salmonella was found in "all locations" of the internal organs of the chickens.  In each case Dr. Trampel again noted that serogroup D Salmonella "isolated from laying hens usually is identified as being Salmonella enteritidis," and that the samples would be sent to the NVSL for confirmation of the presence of SE.  *See* Exhibit 14.

70.     The NVSL confirmed on June 4, 2010, that the internal organs from Layer 6 and Layer 3 chickens were contaminated with Salmonella enteritidis.  The NVSL confirmed on June 11, 2010, that the internal organs from Layer 5 (Alden Farm) chickens were contaminated with Salmonella enteritidis.  (**EXHIBIT 15.**)

19

SECOND AMENDED COMPLAINT

71.     Despite these test results, defendants continued to sell eggs from SE contaminated farms and chickens, and they did not notify regulators, egg purchasers, or the public about the widespread SE contamination inside their laying hens.  This intentional misconduct was consistent with the defendants' pattern and practice of hiding the true conditions at their farms from customers, regulators and the public so that the defendants could continue to profit from their contaminated farms.

**E.     On May 28, 2010 – months after learning about widespread SE contamination at their farms – defendants discuss a plan to address the contamination.**

72.     On May 28, 2010, Tony Wasmund discussed the ongoing SE problem with Dr. Charles Hofacre.  After that meeting, Dr. Hofacre emailed his recommended plan of action to Pat DeCoster, Peter DeCoster, John Glessner and Wasmund.  Dr. Hofacre instructed Pat DeCoster to give the information to defendant Jack DeCoster.  (**EXHIBIT 16**.)

73.     In Dr. Hofacre's email, entitled "Iowa Salmonella":

a.      Dr. Hofacre proposed that another expert, Dr. Maxcy Nolan, "focus on the farms with current SE positive results," starting with "empty or soon to empty pullet houses," then "pullet houses with current results of SE," then "layer houses about to empty with a history of SE," and finally "layer houses with SE history within the last year."  After that, they could "work on the general program."

b.      Dr. Hofacre said Wasmund would "update weekly reports on the latest results of the SE testing of pullets and layer farms" and would "create a report that goes back 1 year on all the SE results of the breeders in Minn."[3]

---

[3] Midwest Hatchery is located in Minnesota.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

c.     Dr. Hofacre said the SE response team (including him, Wasmund, Peter DeCoster, and perhaps others) would talk weekly to discuss positive SE tests.  He said they would discuss issues such as whether to treat "the new chicks in pullet houses 4, 5, and 6…with an antibiotic to clean up the salmonella right before we move [them] to the layer farm."

74.    Dr. Hofacre also wrote: "I think with the level of SE in all farms both pullets and layers we need to have a 14 day downtime minimum and dry clean and formaldehyde fumigate all the houses (pullets and layers) when they empty in Iowa for the next year.  We have to get this level of SE knocked down!"

75.    Dr. Hofacre's email shows that defendants were well aware of the widespread contamination of their Iowa farms, and nonetheless continued to ship potentially contaminated eggs into the U.S. food supply.

76.    Dr. Hofacre's email also indicates that SE contamination at the Iowa farms, and possibly also at DeCoster's Maine farms, could have been linked to infected chicks that were brought from another DeCoster operation in Minnesota.  That entity was likely Midwest Hatchery.

77.    Despite these early, detailed discussion of the widespread SE problem at the Iowa farms, and the possible role played by a related company's potentially contaminated operations, the defendants did not warn customers, regulators or the public about the dangers posed by the defendants' eggs.  The defendants' intentional misconduct was consistent with their pattern and practice of hiding the true conditions at their farms from customers, regulators and the public so that the defendants could continue to profit from their contaminated farms.

## II.    NuCal's Purchases From Defendants

78.    From March 2010 to July 2010, NuCal purchased shell eggs from the defendants in order to fill customer orders that NuCal could not fill with eggs from NuCal's own farmers.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

79.     NuCal's purchases were through the Egg Clearinghouse, Inc. ("ECI"), a commercial exchange.   After each ECI transaction, the defendants shipped the purchased eggs directly to NuCal's facilities in California or to NuCal's retail customers.

80.     The listed counterparties to NuCal's purchases were "Wright County Egg Production" and "Hillandale Farms of PA, Inc."   However, other defendants were directly involved in these transactions.  NuCal's purchases from "Wright County Egg" were shipped from either "Decoster Egg Farms of Iowa" or "Quality Egg," and in some cases the invoices were remitted to Environ.   Other DeCoster Parties were involved through their ownership and management of other DeCoster Parties or through their direct supervision of Iowa farm operations. NuCal's purchases from Hillandale PA were processed by Hillandale Farms LLC and were shipped from Hillandale Farms in Alden, Iowa.  When the recalls were announced, the entities announcing the recalls were "Wright County Egg" and Hillandale Farms, not Quality Egg and Hillandale PA.

81.     NuCal purchased 125,265 dozens of eggs from "Wright County Egg" in March and April 2010.  At the time of those purchases, the DeCoster Parties knew that their farms were contaminated with SE, but did not disclose this fact to NuCal.

82.     In May 2010, NuCal made additional purchases from "Wright County Egg" and Hillandale PA.   At the time of NuCal's orders, the defendants knew about widespread contamination at their farms, including multiple confirmed SE tests at Layers 1, 2, 3, and 4. Within days of delivering these orders, the defendants received new confirmed SE tests at Layer 6, and they received reports that SE was in the carcasses of chickens from Layer 5 (Alden Farm).

83.     Neither the DeCoster Parties acting as "Wright County Egg" nor the Hillandale Defendants informed NuCal of these test results.   In June and July 2010 NuCal purchased additional millions of eggs from "Wright County Egg" and Hillandale Farms.   During these

transactions none of the defendants disclosed the confirmed contamination of their facilities, or the confirmed contamination of their laying hens.   Nor did they make such disclosures after the transactions, or after their eggs were delivered to NuCal, or after NuCal began processing, packaging and shipping the tainted eggs to NuCal's customers.

III.    **Defendants Mislead Customers About The Problems With Eggs From The Defendants' Farms**

84.    In May and June 2010, ECI began warning egg sellers that a new FDA rule would become effective on July 9, 2010.   This rule (the "FDA egg rule") provides that if a shell egg producer has a positive SE environmental test, the producer must test a random sample of shell eggs for SE contamination before it can sell them.   In the alternative, the producer can divert all eggs from the contaminated farm to a "breaking facility" where the eggs are removed from their shells and pasteurized to kill any SE in the eggs.

85.    In early 2010 the defendants knew the egg rule would take effect later that year, and that the defendants' customers would expect them to comply with the new rule.   Defendants did not tell customers, regulators or the public that they would not follow the egg rule, and that they would not test their eggs or divert them despite scores of SE-positive tests before July 9, 2010.

86.    On July 9, 2010, the FDA's new egg safety rule took effect.   Between July 9, 2010 and the defendants' recalls in August 2010, the defendants violated the FDA egg rule in that they did not divert eggs from contaminated farms or initiate egg tests to insure that their contaminated farms were not producing infected eggs.   Defendants failed to take the required actions, and did to notify customers of this failure, despite the fact that further tests after July 9 showed continuing SE contamination at the defendants' laying farms and pullet farms.   *See* Exhibit 2.   For example:

a.    On July 13, 2010, samples from Layer 3 that were collected in late June 2010 tested positive for SE (Accession No. 2010018503).

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

23

> b.   On July 16, 2010, samples from Pullet 6 and Layer 4 that were collected in late June 2010 tested positive for SE (Accession Nos. 2010018907, 2010018911).
>
> c.   On July 22, 2010, samples from Layers 1, 2, 3, 4 and 6 that were collected in June 2010 tested positive for SE (Accession Nos. 2010017321, 2010017322, 2010017351, 2010017352, 2010017544, 2010017549, and 2010017550).

87.   As a result of the defendants' deception, customers did not know that eggs the defendants sold before July 9 were tainted, or that eggs the defendants sold after July 9 were tainted.  Had customers such as NuCal been aware of the true state of facts, they would have taken steps to prevent the defendants' eggs from causing further illness, and they would have halted further purchases of the defendants' eggs.

88.   Around July 9, 2010, ECI also included clauses in its egg purchase confirmations that cited the FDA egg rule.  Those clauses provided that:

> All sellers must comply with FDA regulations regarding Production, Storage, and Transportation of Shell Eggs and must also notify ECI if any eggs offered for sale through ECI originate from environments that have tested positive for Salmonella Enteritidis (SE) or originate from flocks whose eggs have tested positive for SE.  If you fail to comply with these regulations you agree to indemnify both Egg Clearinghouse and Egg Clearinghouse Members for any damages.

These clauses on ECI invoices constituted both a warranty of compliance with the FDA egg rule and a commitment to notify customers of SE contamination in the egg farms and laying hens from which the eggs were produced.

89.   The defendants continued to sell eggs to NuCal and other customers after July 9, 2010, with full awareness that these ECI clauses were on invoices to NuCal and other customers.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

However, between July 9, 2010, and the first recall on August 13, 2010, the defendants did not notify NuCal or ECI that the defendants' farms had tested positive for SE, or that the defendants' laying hens had also tested positive for SE.  Nor did defendants notify NuCal or ECI when additional test results received after July 9, 2010, confirmed the continued SE contamination at the defendants' farms.  Nor did the defendants notify NuCal of these problems after NuCal received the eggs, despite knowing that NuCal would be re-packaging and selling the eggs to downstream customers.

90.     Between March 4, 2010 – when defendants first learned about widespread contamination at their Iowa farms – and July 2010, NuCal purchased 397,575 dozens of eggs from "Wright County Egg."   The DeCoster Parties sold these eggs despite knowing of SE contamination at their farms.  Of those purchases, 272,310 dozens were recalled by "Wright County Egg," including:

    a.    72,000 dozens shipped to NuCal's August facility on May 22, 25 and 28, 2010;

    b.    92,700 dozens packaged by Wright County into Lucerne™ brand cartons and shipped to NuCal's Denair facility on May 28 and 29, 2010;

    c.    23,400 dozens shipped to NuCal's Dwight Bell facility on June 18, 2010; and

    d.    84,210 dozens shipped to NuCal's Denair facility on July 2, 17 and 23, 2010.

91.     From May 2010 to July 2010 NuCal purchased 148,485 dozens of recalled shell eggs from Hillandale Farms, including:

    a.    25,200 dozens shipped to NuCal's Dwight Bell facility on May 25, 2010;

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

b.  50,400 dozens shipped to NuCal's Hillmar Griffith facility on May 30, 2010;

c.  24,285 dozens shipped to NuCal's August facility on July 12, 2010;

d.  24,300 dozens shipped to NuCal's Hillmar Griffith facility on July 12, 2010; and

e.  24,300 dozens shipped to NuCal's Hillmar Griffith facility on July 17, 2010.

92.  In accordance with usual practice in the industry, NuCal sold the eggs it purchased from "Wright County Egg" and Hillandale together with eggs from other sources.  NuCal sold and distributed these eggs to several retail customers.

**IV.  The Recall**

93.  Defendants' egg farms and pullet farms continued to show SE positive tests in August 2010.  *See* Exhibit 2.  For example:

d.  On Aug. 3, 2010, several samples from Layers 1, 2, 3 and 4 that were collected in late June 2010 tested positive for SE (Accession Nos. 2010018502, 2010018504, 2010018505, 2010018509, and 2010018510).

e.  On Aug. 3, 2010, samples for Pullet 6 that were collected in late June 2010 tested positive for SE (Accession No. 2010018908).

f.  On Aug.4, 2010, a sample from Layer 3 that was collected in late July 2010 tested positive for SE (Accession No. 2010021222).

g.  On Aug. 5, 2010, Dr. Frana notified Wasmund that a sample from Layer 5 (the Alden Farm) (Accession No. 2010022098) tested positive for SE using a rapid SE test.  (Dr. Frana would later tell Wasmund that a different test confirmed SE in this sample.)

94.  Defendants did not notify NuCal, regulators or the public of these results.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

95.     On August 9, 2010, the FDA contacted "Wright County Egg" as part of the FDA's investigation into an SE outbreak.  According to the FDA's account of the outbreak, the earliest cases were reported in May 2010 – at a time when the defendants were already well aware of widespread SE contamination at their farms.

96.     On August 10, 2010, Wasmund had a conference call with federal regulators.  On information and belief, the call concerned an outbreak of SE, and included identification of the SE strain behind the outbreak.  That same day Wasmund emailed Dr. Hofacre about the SE strain – Jegxo1.0004.  Dr. Hofacre replied that Wasmund would have to educate regulators on "why we do certain things," and explain that "we stopped molting…because we feel that is the right thing to do once we realized we had SE."  (**EXHIBIT 17.**)

97.     "Wright County Egg" did not announce a recall of its eggs until August 13, 2010. Glessner, who was at time acting as an agent for all the defendants, initially argued that only one layer farm should be recalled, despite the fact – apparently undisclosed to the FDA at the time – that scores of environmental tests of the other farms showed SE contamination.  (**EXHIBIT 18**.) In response to FDA pressure, "Wright County Egg" eventually initiated a recall limited to three farms, but it later expanded the recall to include eggs from two other of its Iowa farms.  The recall notices issued by "Wright County Egg" did not mention Quality Egg.  (**EXHIBIT 19.**)

98.     Around this time, the FDA sought documents from the defendants about SE tests at the defendants' farms.  "Wright County Egg" provided a handful of tests results from Layers 1, 2, 3, 4 and 6, of which several showed SE contamination.  According to an internal account, Wasmund told the FDA that the SE positive results were related to "research for the SE program which involves vaccination."  (**EXHIBIT 20.**)

99.     Hillandale Farms issued its own voluntary recall on August 20, 2010.  The Hillandale Farms notice did not mention Hillandale PA.  Hillandale Farms gave earlier notice to some customers, but not NuCal.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

100.    In response to these voluntary recalls, and in order to protect consumers from eggs that defendants had identified as tainted, NuCal announced its own recalls on August 17, 2010 (relating to "Wright County Egg" eggs) and August 20, 2010 (relating to Hillandale Farms eggs). NuCal's retail customers subsequently made demands on NuCal for recall-related refunds and expenses, and took credits against amounts due to NuCal to cover these refunds and expenses.

101.    NuCal also faces potential lawsuits from consumers who claim to have been sickened by the recalled eggs.

102.    NuCal has also incurred its own internal costs in dealing with the recalled eggs.

103.    NuCal further lost profits that it would have earned had the defendants not sold tainted eggs to NuCal, and had consumer demand not dropped precipitously after the recalls.

104.    As a result of defendants' conduct, NuCal also faces a loss of business for egg brands that it sold and that have now become associated with the defendants' practices.  At least one NuCal customer refused to accept further shipments of cartons bearing a brand name that was included in the recall.  The defendants' conduct also resulted in a decline in egg sales by NuCal and others.

105.    The defendants were well aware of the exposure that NuCal faced, but they nonetheless engaged in the practices described above, including failing to control SE outbreaks, failing to inform customers and consumers of dozens of positive SE tests at their farms, continuing to sell eggs from SE positive farms and chickens, and delaying a recall despite knowing for months that their farms and chickens were contaminated with SE.

**V.    After The Recall, Random Egg Tests Reveal Widespread SE Contamination In Eggs From The Defendants' Farms.**

106.    Following the recall, the defendants finally began testing their eggs for SE.

107.    The tests, which were performed on random batches of 50 eggs each, revealed widespread SE contamination in the defendants' eggs.  *See* Exhibit 7.  For example:

a.    A September 2, 2010 report showed that 8 of 50 eggs from Layer 6 were infected with SE (FSNS Report No. 10-083358).

28

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

b.      A September 2, 2010 report showed that 14 of 50 eggs from Layer 4 were infected with SE (FSNS Report No. 10-083304).

c.      A September 7, 2010 report showed that 14 of 50 eggs from Layer 3 were infected with SE (FSNS Report No. 10-083961).

d.      A September 7, 2010 report showed that 4 of 50 eggs from Layer 1 were infected with SE (FSNS Report No. 10-083810).

e.      A September 8, 2010 report showed that 21 of 50 eggs from Layer 5 (Alden Farm) were infected with SE (FSNS Report No. 10-086672).

f.      A September 24, 2010 report showed that 13 of 50 eggs from Layer 2 were infected with SE (FSNS Report No. 10-094890).

108.    In total, at least 170 eggs from the defendants' random tests were contaminated with SE.  Had the FDA not notified defendants of its investigation, and pushed for a recall, these eggs – along with thousands of other likely contaminated eggs – would have been purchased by unsuspecting customers and consumed by the public.

**VI.    After The Recall, The Defendants Fail To Provide Critical Test Samples And Reports To The FDA**

109.    In August 2010 the FDA requested access to the samples that the defendants had tested for SE.  On September 1, 2010, Jolyda Swaim, counsel for Quality Egg and possibly other DeCoster Parties, instructed the ISU VDL that they could release only samples taken "**since** July 9, 2010." (Emphasis original.)  (**EXHIBIT 21.**)  Tony Wasmund also spoke with ISU VDL scientist Timothy Frana about holding back earlier SE samples.  In other words, the defendants refused, at least initially, to give federal regulators access to the scores of samples taken before July 9, 2010, that would have showed which strains of Salmonella were contaminating the defendants' farms and chickens.  These samples could have shown, for example, whether Salmonella Heidelberg strains or other SE strains at the farms were associated with separate outbreaks.  The defendants' intentional misconduct was consistent with their pattern and practice of misleading regulators and hiding the true conditions at their farms from customers, regulators and the public.

110.    The defendants also apparently failed to provide a full set of Salmonella test reports to the FDA and other regulators.

111.    For example, in early September 2010 the House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, posted a handful of ISU VDL reports on its website.  Only one of those reports showed an SE positive test result in 2010.  On September 14, 2010, the subcommittee asked Jack DeCoster why he failed to produce this handful of reports, and asked why "you did not inform the Committee of the *potentially* positive *Salmonella* Enteritidis test results."  (First emphasis added; second original.)  In fact, as described above, there were scores of *confirmed* positive SE test results at the defendants' facilities in early 2010, and dozens of reports showing this *confirmed* contamination.  The subcommittee's letter strongly suggests that the defendants withheld these earlier reports from the subcommittee, and the FDA.  Such intentional misconduct would be consistent with the defendants' pattern and practice of misleading regulators and hiding the true conditions at their farms from customers, regulators and the public so that the defendants could continue to profit from their contaminated farms.

**VII.    Defendants Testify Before Congress**

112.    Executives of the defendants testified under oath before the House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, on September 22, 2010.

113.    At the hearing Peter DeCoster, who identified himself as the Chief Operating Officer of "Wright County Egg," admitted that the SE outbreak was due to eggs sold by "Wright County Egg."  Peter DeCoster acknowledged that tests by the Food and Drug Administration ("FDA") in August 2010 "confirmed that Wright County Egg was producing eggs contaminated with SE."  Peter DeCoster confirmed that the Alden Farm also tested positive for SE contamination.

114.    Although the subcommittee questioned the DeCosters about why the outbreak occurred, and what "Wright County Egg" did in response, Peter DeCoster did not mention that the SE contamination had been going on for months at the Iowa farms, or that SE had been found in every farm and in chickens from several farms.  He did not mention that "Wright County Egg" had initially withheld certain information from the FDA, or that the subcommittee may not have

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   received scores of early 2010 reports showing SE in the Iowa laying farms, pullet farms and

2   chickens.

3      115.   Peter DeCoster also claimed that a feed ingredient used by "Wright County Egg"

4   and Hillandale Farms may have been the source of the SE contamination.  He did not mention the

5   possibility that a related company – Midwest Hatchery – may have had a role in the outbreak,

6   despite the subcommittee's questions about what caused the outbreak.  Nor did he mention that

7   Quality Egg used recycled eggshells from its farms in its chicken feed, which was an alternative

8   source of SE contamination in the chicken feed.  Nor did he mention that another strain of SE –

9   not the Jegxo1.0004 strain – was found at the Quality Egg feed facility.

10      116.   Hillandale Farms president Orland Bethel refused to testify after invoking his rights

11   under the Fifth Amendment of the U.S. Constitution.

12      117.   Hillandale Farms representative Duane Mangskau testified that Hillandale "has no

13   ownership interest" at the Alden Farm, and that Hillandale Farms had "terminated our marketing

14   relationship with" Wright County Egg "because we were disappointed with the test results there."

15   He did not mention that Hillandale Farms had a role in the management and operation of the

16   Alden Farm.  Nor did he mention that, prior to the recall, the Alden Farm employees were

17   Hillandale employees and Hillandale held title to the eggs themselves.  *See* Exhibit 10.

18

19      118.   Mangskau also testified that when the FDA first told Hillandale that it was linked

20   to an SE outbreak, "we were, to be honest, shocked by the allegation."  Mangskau did not mention

21   that he personally performed some SE testing for Hillandale in June 2010, and that the samples he

22   collected tested positive for SE in July 2010.  Nor did he mention that Hillandale's veterinary

23   experts instructed him to conduct egg tests after any SE-positive finding, but that Hillandale

24   ignored this advice before the recall.  (**EXHIBIT 22**.)

25

26      119.   Despite being asked about his knowledge of problems at the farms, Mangskau

27   never informed Congress that he knew that in May 2010 bird carcasses were being tested at

28

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

31

several Iowa farms, including the Alden Farm, in response to high mortality at the farms.  Those tests came out positive for SE.  Nor did Mangskau mention that he was involved in an effort in July 2010 to vaccinate the birds against SE, among other things.

120.    At the time the defendants provided incomplete information to regulators and Congress, the defendants likely knew they could face potential lawsuits if the truth was known about their conduct before the recall.  The defendants were also likely aware that certain customers had not yet paid for eggs they received from the defendants, and that these customers would be less likely to pay if they knew the truth about the defendants' conduct.

## VIII.   Months After The Iowa Recall, Ohio Fresh Eggs LLC – A Company Managed By John Glessner That Has Ties To DeCoster Enterprises – Sells Eggs From SE Contaminated Farms

121.    In early October 2010, Ohio Fresh – an Ohio egg farm managed by John Glessner, co-owned by Hillandale Farms LLC, and which DeCoster Enterprises had an option to purchase – discovered that it had SE in its environment.  According to government regulators, Ohio Fresh learned about the first SE positive result on October 4, 2010, and the farm later learned that a total of 13 samples had tested positive for SE.  These SE positive tests include two *egg* tests, meaning that Glessner and Ohio Fresh were aware that eggs, and not just the egg-laying environment, were contaminated by SE.  *See* Exhibit 8.

122.    Despite these positive SE tests, Glessner and Ohio Fresh decided to sell eggs from their contaminated farms on the open market.  Specifically, on October 7, 2010, Ohio Fresh sold 798 cases of eggs from a house that it knew was contaminated with SE.[4]

---

[4] The FDA's February 25, 2011 letter to Glessner, then-CEO of Ohio Fresh, described the farm's multiple violations of the FDA egg rule.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

123.    The FDA did not discover this illegal shipment until early November 2010.  When the FDA notified Ohio Fresh that it was aware of the shipment, Ohio Fresh initiated a recall on November 5, 2010 – nearly a month after the eggs had been shipped and sold.

124.    Documents produced by the defendants suggest that Ohio Fresh knew it had SE contamination in its pullets early in 2010, but nonetheless continued to ship pullets to Jack DeCoster's Maine egg farms.

## IX.    Months After The Iowa Recall, Salmonella Contamination Remains At Defendants' Iowa Facilities

125.    Environmental samples from the defendants' Iowa farms continued to test positive for SE through the end of 2010.  *See* Exhibit 2.  For example:

> a.    On January 4, 2011, samples from Layer 4 that were collected on December 9, 2010, tested positive for SE (Accession Nos. 2010036561, 2010036568).

> b.    On January 12, 2011, samples from Layer 1 that were collected on December 23, 2010, tested positive for SE (Accession No. 2010038351).

> c.    On January 13, 2011, samples from Layer 6 that were collected on December 29, 2010, tested positive for SE (Accession Nos. 2010038620, 2010038759).

126.    Environmental samples from the Iowa farms also continued to test positive for Salmonella Heidelberg.  For example:

> a.    On January 4, 2011, samples from Pullet 6 that were collected on December 7, 2010, tested positive for Salmonella Heidelberg (Accession Nos. 2010036058, 2010036059).

> b.    On January 4, 2011, samples from Layer 4 and Pullet 8 that were collected on December 9, 2010, tested positive for Salmonella Heidelberg (Accession Nos. 2010036561, 2010036562, 2010036568).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

  c. On January 12, 2011, samples from Pullets 1 and 7 that were collected on December 17, 2010, tested positive for Salmonella Heidelberg (Accession Nos. 2010037434, 2010037437).

 127. These test results coincided with defendants' continued purchases of hens from Midwest Poultry, which registered scores of positive Salmonella Heidelberg test results in that same time period. *See* Exhibit 13.  For example:

  a. On December 10, 2010, the UM VDL found that 84 samples from Midwest collected on November 16, 2010, were positive for Salmonella Heidelberg (Accession No. M10-051849).

  b. On December 22, 2010, the UM VDL found that 62 samples from Midwest collected on November 23, 2010, were positive for Salmonella Heidelberg (Accession No. M10-053030).

  c. On January 2, 2011, the UM VDL found that 18 samples from Midwest collected on December 7, 2010, were positive for Salmonella Heidelberg (Accession No. M10-054900).

 128. Defendants' conduct after the recall is consistent with their pattern and practice of disregarding known Salmonella contamination, and misleading regulators, consumers, and customers about the true nature of defendants' operations.

## FIRST CLAIM FOR RELIEF

**(Breach of Implied Warranty of Merchantability)**
**(against defendants Quality Egg and Hillandale PA)**
**(California Commercial Code § 2314)**

 129. NuCal incorporates the allegations of Paragraphs 1 through 128 above by reference as though fully set forth herein.

130.    Under the California Commercial Code there is an implied warranty of merchantability for any goods sold.   To be considered merchantable under the California Commercial Code, goods must be of fair average quality and must be fit for the ordinary purposes for which such goods are used, among other things.

131.    Defendants Quality Egg and Hillandale PA breached this implied warranty because the eggs they sold to NuCal were not merchantable, in that defendants' eggs were not of fair average quality due to likely contamination with SE and were not fit for the ordinary purpose for which they were to be used (i.e. human consumption) due to likely SE contamination.   The August 2010 recall of the eggs, and the defendants' public admissions that defendants' farms were the source of the SE outbreak, confirm these defendants' breach of the implied warranty.

132.    As a result of defendants' breach, NuCal incurred damages related to the recalled eggs, including lost sales and increased labor costs, shipping costs, and overhead costs.

133.    As a result of defendants' breach, NuCal's buyers have also made demands for credits for the recalled eggs, as well as claims for their incidental and consequential costs related to the recall, and NuCal has suffered losses as a result of these credits and other demands.

134.    NuCal has also suffered losses to the extent it paid for eggs that were unmarketable, and has lost profits that it would have earned had the eggs been merchantable, which the defendants' own recall confirmed was not the case.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### (Fraud)
### (against defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC)

135.    NuCal incorporates the allegations of Paragraphs 1 through 128 above by reference as though fully set forth herein.

136.     The DeCoster Parties, including defendant Quality Egg, were part of a consolidated egg enterprise that operated Layers 1, 2, 3, 4 and 6.

137.     Defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC were part of a related egg enterprise that operated Layer 5 (the Alden Farm).  Defendants acted through common agents with respect to their operation of Layer 5.  Those agents included managers such as Tony Wasmund, Duane Mangskau and John Glessner who were responsible for addressing and preventing SE contamination in the eggs produced at the farm.

138.     Defendants were in the business of producing, processing and selling shell eggs for human consumption.  Defendants were aware that certain conditions – including the presence of SE in pullets, the presence of SE in laying hens, and the presence of SE in the environment of an egg farm – could lead to the contamination of shell eggs with SE, a pathogen that could lead to food-borne illness.  Defendants were aware that if such conditions were known to potential egg buyers, those buyers would not purchase the Defendants' eggs.

139.     Starting no later than February 2010, defendants learned that SE was likely contaminating their farms.  In the weeks and months that followed, defendants received scores of reporting showing that every one of their farms was contaminated by SE, and that many of their pullet farms were also contaminated with SE.  During this time the defendants also learned that SE was in the internal organs of hens recovered from some egg farms.  Rather than initiate immediate clean-up operations, tests eggs for SE, and divert tainted eggs out of the food supply, Defendants chose to continue selling eggs without any warnings or disclosures to customers, regulators, or the public.  Defendants knew their eggs were tainted, and deliberately refused to take steps to ensure the public, and the defendants' buyers, were protected.

140.     Defendants sold eggs to NuCal that defendants knew were intended for retail sale and human consumption, and that were sold with an implied warranty of fitness for these

particular uses.  Defendants also knew that NuCal, like any buyer, was only purchasing defendants' eggs on the basis of the implied warranty that the eggs were merchantable. Defendants also knew that warranties existed with respect to egg sales through ECI after July 9, 2010, and that the parties selling the eggs to NuCal had committed to notifying ECI (and by extension NuCal) of any SE contamination in the farms or chickens from which the eggs originated.  As such, defendants had a duty to disclose to NuCal that defendants' eggs were from contaminated farms and laying hens.

141.   Defendants did not disclose this information to NuCal, either before their sales to NuCal, before their delivery of eggs to NuCal, or after their delivery of eggs to NuCal.  Instead, they continued to sell eggs from contaminated farms and chickens to NuCal and other buyers.

142.   Defendants failed to disclose problems at their farms to NuCal because they knew that NuCal would have stopped purchasing from defendants, would have insisted on a recall, and would have insisted on a refund for any unsold tainted eggs.  By their omission, defendants intended to prevent NuCal from discovering the true state of affairs, and from taking actions that would have resulted in losses to the defendants.  The DeCoster Parties other than Quality Egg were, either directly or through common agents of their consolidated egg enterprise, aware of the SE contamination and omissions by Quality Egg, Hillandale Farms, Hillandale PA, Hillandale LLC and others, and ratified this nondisclosure.

143.   NuCal relied on the omission to disclose the true state of affairs by the defendants, including nondisclosure of the results of SE tests and the presence of SE contamination at defendants' farms, when NuCal purchased, received, shipped and sold defendants' eggs.  NuCal's reliance was justified in that NuCal was not made aware of the true state of affairs.

144.   For sales after July 9, 2010, defendants Quality Egg and Hillandale PA also warranted that they would comply with the FDA egg safety rule, and promised to notify ECI (and

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

37

by extension NuCal) of any SE positive environmental tests involving the farms that were the source of the eggs sold to NuCal.  This representation was false, as the defendants knew they were not in compliance with the FDA egg safety rule, they did not intend to comply with the rule, and they did not (and did not intend to) notify ECI of the many SE positive environmental tests at the defendants' facilities both before and after July 9, 2010.

145.   NuCal relied on the representations made by the defendants Quality Egg and Hillandale PA for sales after July 9, 2010 – *i.e.*, that the defendants were following federal egg safety rules, and would notify ECI of any SE positive environmental tests involving the farms that were the source of the eggs sold to NuCal – when NuCal purchased, received, shipped and sold defendants' eggs.  NuCal also relied on defendants Hillandale Farms and Hillandale LLC's failure to disclose the true facts about the Alden Farm.  NuCal's reliance was justified in that NuCal was not made aware of the true state of affairs.

146.   As a result of its reliance NuCal suffered damages that include lost sales, lost profits, recall-related administrative costs, and the loss of goodwill and reputation for the brands subject to the recall.  NuCal's buyers have also made demands for credits for the recalled eggs, claims for their incidental and consequential costs related to the recall, and demands that certain brand names be retired due to the recall, and NuCal has suffered losses as a result of these credits and other demands.

147.   The omissions and misrepresentations by the defendants were intentional, malicious, oppressive, or fraudulent, and give rise to liability for exemplary and punitive damages according to proof at trial.  Each of the defendants authorized and/or ratified the wrongful conduct upon which its liability is based, or was personally guilty of oppression, fraud or malice.

WHEREFORE, Plaintiff prays for relief as set forth below.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

### THIRD CLAIM FOR RELIEF

### (Negligence)
### (against defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC)

148.    NuCal incorporates the allegations of Paragraphs 1 through 128 above by reference as though fully set forth herein.

149.    Defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC owed a duty of care to NuCal in that they operated an egg farming enterprise that produced goods that they knew were intended for resale and human consumption.

150.    Defendants breached their duty to NuCal by selling eggs to NuCal from farms and chickens with confirmed SE contamination, and by failing to inform NuCal of this contamination.

151.    Defendants' breaches caused damages to NuCal, including, among other things, lost sales, lost profits, recall-related administrative costs, and the loss of goodwill and reputation for the brands subject to the recall.  NuCal's buyers have also made demands for credits for the recalled eggs, claims for their incidental and consequential costs related to the recall, and demands that certain brand names be retired due to the recall, and NuCal has suffered losses as a result of these credits and other demands.

152.    NuCal's losses were foreseeable to defendants in that it was reasonable to expect that defendants' sale of tainted eggs, their recall of tainted eggs, and their public disclosure of their failure to control Salmonella contamination and timely inform consumers of that contamination, would cause the losses suffered by NuCal and others.

WHEREFORE, Plaintiff prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF

### (Equitable Indemnification)
### (against defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC)

153.    NuCal incorporates the allegations of Paragraphs 1 through 152 above by reference as though fully set forth herein.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

154.    As described above, NuCal purchased eggs from defendants for the purchase and delivery of safe and marketable eggs that were fit for human consumption and retail sale.

155.    Defendants delivered eggs that were not safe or marketable, or fit for human consumption or retail sale.

156.    As a result of defendants' conduct, NuCal's customers have demanded credits or other payment from NuCal for their direct, incidental and consequential costs and losses related to the recall, and NuCal has suffered losses as a result of these credits and other demands.  NuCal has also suffered its own recall-related costs, including increased labor costs, shipping costs, regulatory costs and other overhead costs.  NuCal also faces the potential for future personal injury actions related to the tainted eggs.

157.    NuCal is entitled to full or partial equitable indemnification from defendants for both third party losses and costs and NuCal's own losses and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

**(Negligent Interference with Prospective Economic Advantage)**
**(against defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC)**

158.    NuCal incorporates the allegations of Paragraphs 1 through 152 above by reference as though fully set forth herein.

159.    At the time of the events described above, NuCal had an economic relationship with its retail customers.

160.    Defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC knew that they were selling eggs to distributors which, like NuCal, would repackage those eggs under different brand names and sell them to downstream retailers.  This state of affairs was confirmed when NuCal was revealed as the winning bidder for the defendants' eggs, as NuCal is

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

known as an entity that buys bulk eggs on the open market to augment its own farmers' supplies and then repackages those eggs under different brand names.

161.   As described above, defendants were negligent in failing to control SE on their farms, selling tainted eggs despite their knowledge of the high risk of SE contamination in those eggs, and failing to timely inform customers and consumers of the true risk of SE in their eggs. The result of defendants' acts was a series of voluntary recalls, widespread news coverage of the defendants' practices, and consumer panic over egg safety.

162.   NuCal has suffered lost future business and sales from customers who have blamed NuCal for the disruption, loss of goodwill and food safety panic that resulted from the defendants' negligence and misconduct, or who have associated NuCal and NuCal's brands with the defendants' negligence and misconduct.  For these losses NuCal seeks compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SIXTH CLAIM FOR RELIEF

### (Unfair Competition)
### (against defendants Quality Egg, Hillandale Farms, Hillandale PA and Hillandale LLC)

163.   NuCal incorporates the allegations of Paragraphs 1 through 162 above by reference as though fully set forth herein.

164.   California Business and Professions Code Section 17200 *et seq.*, the Unfair Competition Law, prohibits unfair competition, which includes any unlawful, unfair and/or fraudulent acts or practices and any unfair, deceptive, untrue or misleading advertising.

165.   Defendants' unlawful, unfair and/or fraudulent acts, described in Paragraphs 1 through 162 above, include breaches of the implied warranties of merchantability and fitness for particular purpose, fraud, negligence, and failure to timely inform customers and consumers of the high risk of Salmonella contamination in their products.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

166.   NuCal has suffered actual injury and has lost money or property by virtue of defendants' unlawful, unfair and/or fraudulent acts in that NuCal has suffered monetary losses and has paid for unmerchantable and unfit goods.

167.   NuCal seeks an order restoring to it any money or property, real or personal, which defendants may have acquired by means of the unfair competition described herein.  This includes, at a minimum, all payments made by NuCal and received by the defendants for the recalled eggs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, NuCal prays for judgment as follows:

1.   For damages equal to NuCal's lost profits, NuCal's administrative costs of the recall, costs of refunds and payments to NuCal customers due to the recall, lost goodwill and reputational harm, and for other incidental and consequential damages according to proof at trial;

2.   For punitive and exemplary damages according to proof at trial;

3.   For indemnification of NuCal for the claims of its customers who purchased the recalled eggs, for claims by consumers who purchased the recalled egg brands, and for other recall-related costs borne by NuCal;

4.   For economic damages due to defendants' interference with NuCal's prospective economic advantage, including branded packaging losses, lost profits and loss of goodwill;

5.   For a declaration that NuCal is entitled to full indemnification for any damages, settlements, compromises, judgments or other payments paid by NuCal related to the tainted and recalled eggs;

6.   For restitution to NuCal of any money or property, real or personal, which defendants may have acquired by means of their unfair competition and other misconduct; and

7.     For attorney's fees, costs, and such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff NuCal hereby demands a trial by jury on all issues so triable.

DATED: February 4, 2013

By:   /s/ William M. Goodman
William M. Goodman

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
William M. Goodman (SBN 61305)
Jason S. Takenouchi (SBN 234835)
101 California Street, Suite 2300
San Francisco, CA 94111
Telephone:  (415) 421-6140
Facsimile:  (415) 398-5030

Attorneys for Plaintiff NUCAL FOODS INC.

K A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111